**LAMONICA HERBST & MANISCALCO LLP**
*Counsel to Plaintiff*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500
Adam P. Wofse, Esq.
Michael T. Rozea, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                                                    Chapter 11

Durr Mechanical Construction, Inc.,                        Case No.: 18-13968 (SMB)

                        Plaintiff.

---------------------------------------------------------------x

Durr Mechanical Construction, Inc.,

                        Plaintiff,

      - against -                                                    Adv. Pro. No. 19- (SMB)

I.K. Construction Inc.,

                        Defendant.

---------------------------------------------------------------x

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff Durr Mechanical Construction, Inc. (the "<u>Plaintiff</u>"), by its undersigned counsel, as and for its Verified Complaint against defendant I.K. Construction Inc. ("<u>Defendant</u>"), alleges as follows:

## NATURE OF THE PROCEEDING

1.     Plaintiff commenced this action to obtain declaratory relief, or in the alternative, an injunction to protect its valuable core claims and interests as they relate to the action pending in the Superior Court of New Jersey, Law Division, Essex County ("<u>Superior Court</u>") entitled, *I.K. Construction Company, Inc. v. Durr Mechanical Construction Inc., Port Authority of New York and New Jersey, Covanta Essex Company, Covanta Energy Company, Fidelity & Deposit*

*Company of Maryland, Zurich North America, Corporations A, B, C and D, and Corporations E and F*, Docket No. ESX-L-1490-17 (the "<u>I.K. State Court Litigation</u>").

2.      Due to Defendant's pre-petition breach under the Subcontract (defined below), which required Plaintiff to incur $1,305,614.00 in *additional* fees and costs to complete the work (which Defendant was contractually required to provide under the Subcontract), Plaintiff asserted various affirmative defenses and counterclaims (which are core claims) in the I.K. State Court Litigation ("<u>Plaintiff's Affirmative Claims</u>").

3.      Due to Defendant's own inaction in failing to act in accordance with the Disposition Order (which required Defendant to move for stay relief within thirty (30) days of entry of the order (i.e. - by January 9, 2019)), Plaintiff was administratively dismissed from the I.K. State Court Litigation.

4.      Now with Plaintiff administratively dismissed from the I.K. State Court Litigation, and more importantly, Plaintiff's counterclaims worth over $1.3 million also having been administratively dismissed, Defendant is attempting to continue the action against Plaintiff's surety and debtor-in-possession lender, Zurich American Insurance Company and its subsidiaries and affiliates including, but not limited to, Fidelity And Deposit Company of Maryland (collectively "<u>Zurich</u>") and the remaining non-party defendants.

5.      By virtue of Plaintiff's indemnification obligation to Zurich, and the nature of the claims asserted, the I.K. State Court Litigation is not an action which can be bifurcated between Plaintiff and the other defendants.

6.      As set forth more fully below, there is an identity of interest between Zurich and Plaintiff pursuant to the Zurich Indemnity Agreement (defined below), which obligates Plaintiff to indemnify Zurich for any costs or expenses incurred in connection with the surety Bonds

provided by Zurich, and therefore, any action against Zurich is an action against Plaintiff's estate. Accordingly, Plaintiff seeks entry of an order extending the automatic stay to the action, or in the alternative, a preliminary and permanent injunction to prevent the matter from proceeding against non-debtor parties.

7.      This Adversary Proceeding is further brought pursuant to section 542 of title 11 of the United States Code ("Bankruptcy Code") and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rules") 3007 to disallow and expunge proof of claim 60-1 filed by Defendant with the Clerk of the Court in the amount of $1,924,128.00 (the "Proof of Claim").

8.      This Adversary Proceeding also seeks damages relating to Defendant's breach of the Subcontract (defined below) and Defendant's breach of its implied duty of fair dealing, along with asserting claims for turnover of property of the estate and unjust enrichment.

## JURISDICTION AND VENUE

9.      Since this action arises under the pending Chapter 11 bankruptcy case of Plaintiff, the United States Bankruptcy Court for the Southern District of New York ("Court") has jurisdiction over this action under 28 U.S.C. §§ 157 and 1334 and Bankruptcy Rules 6009 and 7001.

10.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A), 157(b)(2)(B), 157(b)(2)(C), 157(b)(2)(E) and 157(b)(2)(G).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

12.     Plaintiff consents to the entry of final orders and judgment by this Court if it is determined that this Court, absent the consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES

13.     Upon information and belief, Defendant has a principal place of business at 1118 E. Baltimore Ave., Linden, New Jersey 07036.

14.     Plaintiff is the Chapter 11 Plaintiff with its principal place of business at 2395 Route 715, Tannersville, Pennsylvania 18372.

15.     Plaintiff is authorized to assert its claims under Bankruptcy Rule 6009.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

### I. Plaintiff's Bankruptcy Filing

16.     On December 7, 2018 (the "Petition Date"), Plaintiff filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

17.     Plaintiff has continued, in a limited manner, with the management of its business and operation of its affairs as a debtor and debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed and no official committee of unsecured creditors has been formed.

18.     On January 18, 2019, the Court entered the Interim Debtor-in-Possession Order ("Interim DIP Order") which authorized Plaintiff to borrow post-petition funds and approved Plaintiff's entry into the Debtor-in-Possession Loan Agreement and Joint Prosecution Agreement. [Dkt. No. 111].

19.     The Joint Prosecution Agreement, in Paragraph B, recites as follows:

> As partial consideration for the issuance of the Bonds, DMC and others executed and delivered to Zurich an Agreement of Indemnity dated July 1, 2008 ("**GIA**"). A true and correct copy of the GIA is attached and incorporated by reference as **Exhibit B**. Pursuant to the GIA, DMC and others agreed, in substance and among other things, to exonerate, indemnify and hold harmless Zurich from and against any and all liability

for losses, fees, costs and expenses sustained or incurred by Zurich by reason of having executed the Bonds, by reason of the failure of any signatory to the GIA to perform or comply with its terms, and in Zurich's enforcement of the terms of the GIA.

20.    On February 23, 2019, the Court approved the Final DIP Order ("Final DIP Order"), which was entered into between Zurich and Plaintiff. [Dkt. No. 159].

## II.    Plaintiff's Business Relationship with Zurich and Indemnity Obligation

21.    On or around July 8, 2008, Zurich provided Plaintiff with various surety bonds and other instruments in favor of various obligees, and as partial consideration for the issuance of such bonds (the "Bonds"), Plaintiff was a party to, and executed an Agreement of Indemnity with Zurich ("Zurich Indemnity Agreement").   A copy of the Zurich Indemnity Agreement is annexed hereto as **Exhibit "A"**.

22.    Specifically, the second paragraph of the Zurich Indemnity Agreements provides:

> The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interests, court costs and counsel fees) and from and against any and all such losses and/or expenses which the surety may sustain and incur: (1) by reason of having executed or procured the execution of the Bonds, (2) by reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and  conditions of this Agreement or (3) in enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such a payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety, the Contractor and indemnitors further agree that in any accounting between the Surety and Contractor, or between the Surety and the  Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was a liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety.

<u>See</u> Exhibit "A", Paragraph 2.

### III.    <u>The Covanta Essex Baghouse Project</u>

23.    Prior to the Petition Date, on or about June 4, 2014, Covanta Essex Company ("<u>Covanta Essex</u>") entered into a general contract (the "<u>General Contract</u>") in the initial lump sum price of $52,020,000.00, pursuant to which Plaintiff agreed, *inter alia*, to provide labor, equipment, materials, construction, supervision, construction management and other services for the Essex Baghouse Project at Essex County Resource Recovery Facility in exchange for certain consideration as set forth in the General Contract.

24.    In connection with the Project, Plaintiff hired certain subcontractors to perform certain aspects of the General Contract based upon their represented skill and expertise.

25.    In connection with the Project, on or around August 13, 2014, Plaintiff and Defendant entered into a "Subcontract Purchaser Order" relating to streel fabrication and erection work on the Project (the "<u>Subcontract</u>"). A copy of the Subcontract is annexed hereto as **Exhibit "B"**.

26.    In connection with the Subcontract, Defendant represented itself to be an experienced union steel erector, and in the Subcontract, Defendant represented in **bold language** on the first page that:

> **This subcontractor represents that they have sufficient manpower, equipment, tools and materials available to expedite all phases of the work and is familiar with the site, plans, specifications and other contract documents.** (Emphasis in original)

<u>See</u> Exhibit B.

27.    Under the Subcontract, Defendant agreed, *inter alia*, to perform all structural steel fabrication and erection work required under the General Contract for the firm lump sum price of $4,410,000.00.

28.     Attachment "B" to the Subcontract sets forth the Subcontract's terms and conditions (the "Terms and Conditions").

29.     Article 3 of the Terms and Conditions provides that Defendant will hold harmless and indemnify Plaintiff for any loss, or expense incurred due to "[t]he payment of any loss or damage arising from any defects in material or workmanship. . . ."

30.     Article 6 of the Terms and Conditions states:

> In the event [Defendant] delays the progress of the work or the furnishing of material, or fails in the performance of any of the provision of this contract . . . [Plaintiff] shall have the right to cancel this contract upon three days written notice mailed or delivered to [I.K] at its last known address

See Exhibit B.

31.     Article 6 of the Terms and Conditions further provides:

> In the case of such termination . . . if the unpaid balance due [Defendant] exceeds the cost of completion, said amount shall be paid to [Defendant], but if such expense shall exceed such unpaid balance, then [Defendant] shall pay the difference to [Plaintiff]. The expenses incurred by [Plaintiff] shall include all damage and cost incurred through the default of [Defendant].

See Exhibit B.

## IV. I.K's Breach of Subcontract and Termination at the Project

32.     In or around October 2015, Defendant admitted to Plaintiff that it was financially insolvent notwithstanding the fact that Plaintiff had already processed thirteen (13) of Defendant's applications under the Subcontract for amounts in excess of $3,000,000.00 (which amounts to over seventy percent (70%) of the Subcontract price to which Defendant was entitled).

33.     At that time in late October 2015, Defendant assured Plaintiff that it was just suffering a short-term "cash flow issue" and requested that Plaintiff make payments to help keep Defendant operating and also maintain Project continuity and work flow.

34.     Upon information and belief, in or around late October 2015, at Defendant's request (and notwithstanding the fact that Plaintiff was not contractually required to release the retainage as the Project was not complete), Plaintiff released $25,430.32 to Defendant from the retainage held on Defendant's first two payment applications.

35.     Despite Defendant's representations, it failed to resolve its short term "cash flow issue" and instead went deeper into debt with Plaintiff by repeatedly requesting that Plaintiff disburse payments to cover Defendant's payroll, administrative expenses and to pay Defendant's subcontractors whom it failed to pay.

36.     As the Project progressed, it became apparent to Plaintiff that Defendant's costs to complete the Project would exceed its future billings and that it would end the Project in a negative cash position.

37.     By February 18, 2016, Defendant's financial situation had become so dire that its workers walked off the Project (the "Walk Off").

38.     Upon information and belief, the Defendant's workers walked off with no intention on returning because they had not been paid.

39.     As a result of Defendant's conduct as set forth above, on February 18, 2016, Plaintiff provided written notice to Defendant that the Walk Off further delayed the Project, and that Defendant was in default of the Subcontract and had three (3) days to cure its default or Plaintiff would terminate the Subcontract (the "Initial Termination Notice"). A copy of the Termination Notice is annexed hereto as **Exhibit "C"**.

40.     Defendant never cured this default and in fact, Defendant's workers again walked off the job again the following week.

41.	On March 1, 2016, Defendant abandoned the Project four hours early without any advance notice or reasoning provided, causing yet another delay to the Project's completion, at which point Plaintiff advised that if Defendant's workers were not back to work by March 2, 2016, Plaintiff would terminate the Subcontract.

42.	Accordingly, by letter dated March 2, 2016 (the "<u>Termination Letter</u>"), Plaintiff formally canceled the Subcontract due to various breaches of the Subcontract caused by Defendant, including, but not limited to:

a.	Delaying the progress of the work on the Project by failing to make adequate progress to adhere to the Project schedule;

b.	Failing to provide sufficient manpower on the Project to perform work under the Subcontract in accordance with the Project schedule;

c.	Failing to adhere to the proper directions of Plaintiff's Project managers in the performance of Defendant's work on the Project, and through its principals, conducted itself in an un-businesslike, intimidating, irrational and abusive manner toward personnel of Plaintiff and others on the site. That includes, but is not limited to, a June 19, 2015 incident where Defendant's project manager at the time vandalized a Plaintiff's employee car at the Project, which was caught on video, and Defendant's project manager was subsequently barred from the Project;[1]

d.	Failing to remit payments to Defendant's subcontractors and work force, despite Plaintiff advancing funds to Defendant substantially in excess of the value of work completed by Defendant;

e.	Demonstrating an inability or unwillingness to pay Defendant's trade debts and obligations in connection with the Project as they became due;

f.	Failing to perform its scope of work under the Subcontract in accordance with the Project schedule, causing Plaintiff to incur additional costs to complete work not performed by Defendant; and

g.	Incurring hundreds of thousands of dollars in back-charges as a result of Defendant's failure to properly perform work under the Subcontract, as well as its failure to perform certain work under the Subcontract.

A copy of the Termination Letter is annexed hereto as **<u>Exhibit "D"</u>**.

43.	From the date the Subcontract was signed in October 2014, through the date of the Termination Letter, Plaintiff advanced over $4,400,000.00 to Defendant, of which

---

[1] The project manager eventually admitted to keying a Plaintiff's employee car, which result in Covanta banning the I.K. project manager from the Project.

$1,300,000.00 was advanced to Defendant (through nineteen separate advances) to cover either (a) payroll and/or administrative expenses, or (b) advanced directly to Defendant's subcontractors who had not been paid for work performed.

**V. Bond Claims and Liens Filed by Defendant**

44.     On May 1, 2016, Defendant filed a bond claim with Zurich (the "Bond Claim") alleging that Plaintiff breached the Subcontract, and claiming damages of $489,729.00 in retainage, $395,364.80 in unpaid change orders and amounts "to be calculated [] for contract payments."

45.     On or about May 17, 2016, I.K supplemented the Bond Claim with additional claims for damages, bringing the total amount of damages Defendant sought to $1,249,687.00 (the "Public Improvement Lien"). Copies of the Bond Claim and the Public Improvement Lien are annexed hereto as **Exhibit "E"**.

46.     On May 10, 2016, Plaintiff filed a response to the Public Improvement Lien with Zurich. Plaintiff denied all of Defendant's claims, and set forth that the costs Plaintiff incurred to complete I.K's scope of work and the backcharges from Plaintiff to Defendant, exceeded the unpaid balance of the Subcontract and the amounts Defendant claimed to be owed for change orders.

47.     Plaintiff claimed that as of May 10, 2016, Defendant actually owed Plaintiff $357,076.00, and projected that number to grow substantially by the time Plaintiff completed the Project.

48.     On February 20, 2017, Defendant filed an amended bond claim with Zurich, revising its alleged damages to $1,924,128.00 (the "Amended Bond Claim"). A copy of the Amended Bond Claim is annexed hereto as **Exhibit "F"**.

## VI. Plaintiff's Damages Under the Subcontract

49.     Article 8 of the Subcontract provides, in pertinent part, "[I]f the unpaid balance due the Subcontractor exceeds the cost of completion, said amount shall be paid to Subcontractor, but if such expense shall exceed such unpaid balance, then the Subcontractor shall pay the difference to the Contractor." See Exhibit B.

50.     As of May 16, 2016, the unpaid balance under the Subcontract consisted of $304,048.00 under the Subcontract, plus $229,652.00 in retainage for a total of $533,700.00.

51.     As of August 10, 2017, the actual costs incurred by Plaintiff in completion of the scope of work under the Subcontract included $942,500.02 in direct labor, $87,496.95 in tools and material and $308,194.08 for vendors and subcontractors, for a total of $1,305,614.00.

52.     Defendant has failed and refused to pay the monies it owes to Plaintiff under the Subcontract, despite due demand therefor.

53.     As in every contract, the Subcontract contained an implied covenant or good faith and fair dealing, obligating Defendant to act in good faith and deal fairly in fulfilling its contractual obligations, so as to not to injure Plaintiff or deprive Plaintiff of its right to receive benefits under the Subcontract.

54.     As more fully set forth above, Defendant breached the Subcontract and the implied covenant of good faith and fair dealing inherent therein.

55.     Plaintiff fully performed all of the terms and conditions of the Subcontract, and changes thereto that Plaintiff was required to perform, except insofar as Plaintiff's performance was waived, prevent, frustrated, hindered or excused by Defendant.

56.     As a direct and/or proximate result of the foregoing, Plaintiff has been damaged to an extent not fully determined, including but not limited to, damages it was forced to incur by virtue of Defendant's breach of the Subcontract.

## VII. The I.K. State Court Litigation

57.     On February 24, 2017, Defendant commenced the I.K. State Court Litigation by filing a complaint (the "Complaint") in the Superior Court, asserting multiple causes of action against Plaintiff, Plaintiff's surety on the Project – Fidelity & Deposit Company of Maryland ("F&D"), Covanta Energy LLC, Covanta Essex Company, Zurich American Insurance Company, and The Port Authority of New York and New Jersey ("Port Authority").

58.     Certain defendants in the I.K. State Court Litigation filed a motion to dismiss ("Motion to Dismiss") which set June 23, 2017 as the return date.

59.     The Motion to Dismiss sought to (a) dismiss certain causes of action, (b) discharge a certain construction lien claim filed by Defendant on May 23, 2016 in the amount of $885,093.80 (the "Construction Lien"), and (c) directing Defendant to discharge a certain "Lien Upon a Public Improvement" filed on or about May 23, 2016 with the Port Authority in the amount of $1,249,687.35 (the "Public Improvement Lien").

60.     On August 4, 2017, the state court entered an order granting the Motion to Dismiss ("Dismissal Order") which, *inter alia*, dismissed the cause of actions against the defendants (leaving only the Third, Fifth and Sixth Causes of Action against Plaintiff and the Twelfth Cause of Action against Zurich) and discharged the Construction Lien and the Public Improvement Lien.

61.     Specifically, the following claims remained after entry of the Dismissal Order: (a) breach of contract against Plaintiff (third cause of action), (b) a claim for bank statement against Plaintiff (fifth cause of action), (c) violation of New Jersey Prompt Payment Act, N.J.S.A. 2A:30A-2 against Plaintiff (sixth cause of action) and (d) payment on the Bond against Zurich (twelfth cause of action) (collectively, the "Remaining Claims").

62.     On August 17, 2017, Plaintiff filed an answer to the Complaint as well as a counterclaim against Defendant for breach of the Subcontract and breach of the implied duty of fair dealing.

63.     On December 13, 2018, Plaintiff filed a letter with the Court advising of its bankruptcy filing and the implications of the automatic stay pursuant to 11 U.S.C. § 362(a).

64.     On December 14, 2018, the Superior Court issued an order of Disposition on Account of Bankruptcy Proceedings (the "Disposition Order") which required, in part, that within thirty (30) days of entry of the Disposition Order that Defendant make a formal application to obtain permission to proceed, and then subsequently make a motion to vacate the Disposition Order. A copy of the Disposition Order is annexed hereto as **Exhibit "G"**.

65.     Defendant failed to take action with respect to the Disposition Order and, accordingly, Plaintiff was administratively dismissed from the I.K. State Court Litigation.

66.     Upon information and belief, the discovery end date in the I.K. State Court Litigation was April 26, 2019 and discovery has concluded.

67.     On June 20, 2019, the Superior Court posted notice indicating that a status conference is scheduled for July 15, 2019 and a trial in the I.K. State Court Litigation is scheduled for August 26, 2019.

**FIRST CLAIM FOR RELIEF**
**(Request for Declaratory Judgment that the Automatic Stay is Applicable**
**to the I.K. State Court Litigation and Extending Automatic Stay to Zurich)**

68.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "67" as if fully set forth herein.

69.     Bankruptcy Code § 362(a) automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

70.     Bankruptcy Code § 541(a)(1) states that property of the estate is "comprised of . . . all legal or equitable interests of Plaintiff as of the commencement of the case."

71.     The automatic stay is directly applicable to Defendant's efforts to, in effect, obtain a judgment against Plaintiff in the I.K. State Court Litigation.

72.     To prevent this circumvention of the Bankruptcy Code and to avoid the disruption of the plan process, the automatic stay should be extended to the non-debtor third party, Zurich.

73.     The automatic stay is extended to non-debtor third parties in "special" or "unusual" circumstances and such circumstances exist in situations where a debtor's surety is entitled to indemnification from the debtor.

74.     By virtue of the Zurich Indemnity Agreement, there is such identity of interest between the Plaintiff-debtor and Zurich that Plaintiff is said to be the real party in interest and any judgment against Zurich is in effect a judgment against Plaintiff.

75.     Defendant's actions against Zurich are not intended to obtain recovery against Zurich for any action taken by non-party Zurich, but instead is intended to recover estate property without participating in this bankruptcy proceeding.

76.     In this case, Zurich may assert a claim for indemnification by Plaintiff pursuant to Paragraph 2 of the Zurich Indemnity Agreement. See Exhibit A, Paragraph 2.

77.     Based upon the foregoing, Plaintiff has demonstrated "special" or "unusual" circumstances which warrant the extension of the automatic stay to Zurich.

78. Accordingly, Plaintiff seeks: (i) a declaratory judgment that the automatic stay applies to the I.K. State Court Litigation and (ii) extension of the automatic stay to Defendant's proceedings against Zurich.

## SECOND CLAIM FOR RELIEF
### (Request for Injunctive Relief)

79. Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "78" as if fully set forth herein.

80. Plaintiff seeks injunctive relief pursuant to 28 U.S.C. § 105(a), which states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provision of this title."

81. Defendant's claims against Zurich in the I.K. State Court Litigation indirectly seek to obtain estate property and should be enjoined pursuant to the automatic stay.

82. An injunction is appropriate because the imposition of a judgment against Zurich would defeat or impair this Court's jurisdiction with respect to this Chapter 11 case and give the Defendant unwarranted priority over similarly-situated creditors.

83. An injunction is necessary under the facts and circumstances of this matter to prevent the I.K. State Court Litigation from disrupting the plan process.

84. This Court has discretion to enjoin Defendant without requiring Plaintiff-debtor to demonstrate the traditional factors normally required for an injunction such as adequate remedy at law or irreparable harm.

85. Defendant's claims against Plaintiff's indemnitee (Zurich) should be adjudicated in this Court along with Plaintiff's other creditors.

86.     Accordingly, pursuant to Bankruptcy Code § 105(a), Plaintiff requests that the

Court enjoin Defendant's prosecution of the I.K. State Court Litigation against Zurich while the

automatic stay is in effect in order to protect Plaintiff, its estate and the creditors in this case.

**THIRD CLAIM FOR RELIEF**
**(Objection to Proof of Claim)**

87.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through

"86" as if fully set forth herein.

88.     The Proof of Claim was not filed in a form that complies with the applicable

Bankruptcy Rules.

89.     The Proof of Claim contains no backup support for the amounts sought.

90.     Section 502(b) of the Bankruptcy Code provides in pertinent part that:

> [t]he court, after notice and a hearing, shall determine the amount
> of [a] claim in lawful currency of the United States as of the date
> of the filing of the petition, and shall allow such claim in such
> amount, except to the extent that . . . such claim is unenforceable
> against the debtor and property of the debtor, under any agreement
> or applicable law for a reason other than because such claim is
> contingent or unmatured.

11 U.S.C. § 502(b)(1).

91.     Bankruptcy Rule 3001(f) provides in order to constitute prima facie evidence of

the "validity and amount of the claim" the claim must be executed and filed in accordance with

the Bankruptcy Rules. Fed. R. Bankr. P. 3001(f).

92.     Bankruptcy Rule 3001(c)(1) requires that a claim based on a writing must be filed

with a copy of the writing. Fed. R. Bankr. P. 3001(c)(1).

93.     The Proof of Claim lacks sufficient documentation to establish the validity of the

Proof of Claim.

94.     Plaintiff is unable to determine the Proof of Claim's validity due to Defendant's noncompliance with applicable Bankruptcy Rules.

95.     The Proof of Claim is not supported by Plaintiff's books and records.

96.     The amounts sought in the Proof of Claim are not recoverable pursuant to the terms of the Subcontract.

97.     By reason of the foregoing, the Proof of Claim must be expunged in its entirety.

## FOURTH CLAIM FOR RELIEF
### (Breach of Subcontract)

98.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "97" as if fully set forth herein.

99.     The Subcontract is a binding contract between Plaintiff and Defendant.

100.    Upon information and belief, Defendant materially breached the Subcontract by delaying the progress of work as required under the Subcontract.

101.    Upon information and belief, Defendant materially breached the Subcontract by failing to make adequate progress to adhere to the schedule as set forth under the General Contract.

102.    Upon information and belief, Defendant materially breached the Subcontract by failing to keep up to date with payments to its subcontractors and work force as required under the Subcontract.

103.    Upon information and belief, Defendant materially breached the Subcontract by failing to pay its trade debts as they became due as required under the Subcontract.

104.    Upon information and belief, Defendant materially breached the Subcontract by failing to complete all work and provide all materials as required under the Subcontract.

105.    Plaintiff has been damaged by Defendant's aforesaid breaches.

106.     By reason of the foregoing, Plaintiff is entitled to judgment against Defendant in a sum to be determined at trial, but no less than $1,305,614.00, plus attorneys' fees and costs, or such other amounts as may be determined by the Court.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

107.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "106" as if fully set forth herein.

108.     The Defendant was enriched as a result of the amounts received under the Subcontract despite the fact that work was not finished or completed as required pursuant to the terms of the Subcontract.

109.     The Defendant was enriched by the payment of retainage prior to when the retainage became due.

110.     The enrichment of the Defendant was at the expense of Plaintiff and its estate.

111.     The circumstances relating to the payments made under the Subcontract, and subsequent breaches of the Subcontract — which forced Plaintiff to incur additional expenses to properly complete the work required pursuant to the Subcontract — is such that equity and good conscience require that the Defendant compensate the estate for these expenses.

112.     By reason of the foregoing, Plaintiff is entitled to judgment against the Defendant in the amount of $1,305,614.00, plus attorneys' fees and costs, or such other amount as may be determined by the Court.

## SIXTH CLAIM FOR RELIEF
### (Property of the Estate)

113.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "112" as if fully set forth herein.

114.     Plaintiff had a legal and equitable interest in amounts owed under the Subcontract.

115.     Plaintiff's legal and equitable interest in the Subcontract, and amounts due pursuant to its terms, is property of Plaintiff's estate.

116.     By reason of the foregoing, Plaintiff is entitled to the entry of an Order and judgment against the Defendant, under Bankruptcy Code §§ 541 and 542: (a) in the amount of $1,305,614.00; (b) directing the immediate turnover of the amounts due under the Subcontract or the value thereof; and (c) for a full and complete accounting of the Defendant's applications for payment for services performed under the Subcontract.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Implied Duty of Fair Dealing)

117.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "116" as if fully set forth herein.

118.     At all times relevant, Defendant was a party to the Subcontract.

119.     As a party to the Subcontract, Defendant owed Plaintiff fiduciary duties.

120.     Pursuant to New York Business Corporation Law, Defendant owed Plaintiff a fiduciary duty of utmost good faith, care and loyalty with respect to its obligations under the Subcontract.

121.     Defendant failed to exercise proper care in exercising its obligations under the Subcontract and defaulted under the Subcontract.

122.     Defendant owed a duty to Plaintiff and its creditors of utmost care and good faith in fulfilling its obligations under the Subcontract so as not to injure Plaintiff or deprive Plaintiff of its rights to receive monies owed under the Subcontract and/or the General Contract.

123.     The Defendant breached its fiduciary duty to Plaintiff and its creditors by failing to abide by its responsibilities owed to Plaintiff pursuant to the Subcontract.

124.     For the reasons set forth more fully below, Defendant's misconduct and breach of the Subcontract includes, but is not limited to:

a. Delaying the progress of the work on the Project by failing to make adequate progress to adhere to the Project schedule;
b. Failing to provide sufficient manpower on the Project to perform work under the Subcontract in accordance with the Project schedule;
c. Failing to adhere to the proper directions of Plaintiff's Project managers in the performance of Defendant's work on the Project, and through its principals, conducted itself in an un-businesslike, intimidating, irrational and abusive manner toward personnel of Plaintiff and others on the site. That includes, but is not limited to, a June 19, 2015 incident where Defendant's project manager at the time vandalized a Plaintiff's employee car at the Project, which was caught on video, and Defendant's project manager was subsequently barred from the Project;
d. Failing to remit payments to Defendant's subcontractors and work force, despite Plaintiff advancing funds to Defendant substantially in excess of the value of work completed by Defendant;
e. Demonstrating an inability or unwillingness to pay Defendant's trade debts and obligations in connection with the Project as they became due;
f. Failing to perform its scope of work under the Subcontract in accordance with the Project schedule, causing Plaintiff to incur additional costs to complete work not performed by Defendant; and
g. Incurring hundreds of thousands of dollars in back-charges as a result of Defendant's failure to properly perform work under the Subcontract, as well as its failure to perform certain work under the Subcontract.

125.     Defendant breached its fiduciary duty to Plaintiff by failing to abide by the terms of the Subcontract, which includes requests that amounts held for retainage are released prior to when earned, all for Defendant's personal benefit.

126.     Defendant breached its fiduciary duty under the Subcontract and should be required to disgorge the compensation and advancements to it subsequent to termination and the actual costs incurred by Plaintiff to complete the remaining work required under the Subcontract.

127.    As a direct and proximate result of Defendant's breach and failure to act in accordance with the duties imposed upon it by relevant law, Plaintiff and its creditors have been damaged because the assets of Plaintiff have been substantially depleted by the costs Plaintiff was forced to incur to complete the remaining work under the Subcontract.

128.    By virtue of the following, Plaintiff has incurred damages to an extent not yet fully determined, but in an amount to be determined at trial, but not less than $1,305,614.00.

**[Remainder of Page Intentionally Left Blank]**

**WHEREFORE**, Plaintiff demands judgment on its claims for relief against the Defendant as follows:

i. On the first claim for relief, a judgment declaring that the automatic stay applies to the I.K. State Court Litigation and extending the automatic stay to Defendant's state court action against Zurich;

ii. On the second claim for relief, an order enjoining Defendant's prosecution of the I.K. State Court Litigation or any other claims against Zurich;

iii. On the third claim for relief, for an order expunging the Proof of Claim;

iv. On the fourth claim for relief, breach of Subcontract in an amount to be determined at trial, but in no event less than $1,305,614.00; and

v. On the fifth claim for relief, unjust enrichment, in an amount to be determined at trial, but in no event less than $1,305,614.00; and

vi. On the sixth claim for relief, turnover of property of the estate, in an amount to be determined at trial, but in no event less than $1,305,614.00; and

vii. On the seventh claim for relief, breach of the implied duty of fair dealing, in an amount to be determined at trial, but in no event less than $1,305,614.00; and

viii. For such other and further relief as the Court deems just and proper

Dated: Wantagh, New York
July 1, 2019

**LAMONICA HERBST & MANISCALCO, LLP**
*Attorneys for the Chapter 11 Plaintiff*

By: ___*s/ Adam P. Wofse*___
Adam P. Wofse, Esq.
Michael T. Rozea, Esq.
3305 Jerusalem Avenue
Wantagh, New York 11793
(516) 826-6500

<u>VERIFICATION</u>

STATE OF PENNSYLVANIA      )

                                  ) ss.:

COUNTY OF MONROE           )

Robert J. Durr, Jr. being duly sworn deposes and says:

I am the Vice President of Durr Mechanical Construction, Inc., the plaintiff in the within action, and have read the foregoing Complaint and know the contents thereof; that the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true; and the grounds of my belief as to all matters not stated upon my knowledge are based upon the books, records, documents in my possession and conversations with certain non-party witnesses.

<u>s/ Robert Durr</u>
Name:  ROBERT J. DURR, Jr.
Title:    Vice President

Sworn before me this 1st day
of July 2019

<u>s/ Helia Faria</u>
Notary Public
Commonwealth of Pennsylvania – Notary Seal
HELIA FARIA – Notary Public
Monroe County
My Commission Expires: Mar. 1, 2023
Commission Number 1343847