LaMonica Herbst & Maniscalco, LLP
3305 Jerusalem Avenue
Wantagh, New York 11793
516.826.6500
Adam P. Wofse, Esq.
Gary F. Herbst, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

                                               Chapter 11

DURR MECHANICAL CONSTRUCTION, INC.

                                               Case No. 18-13968-SMB

                        Debtor.
-------------------------------------------------------------X

# CHAPTER 11 DEBTOR'S
# <u>DISCLOSURE STATEMENT</u>

**LAMONICA HERBST & MANISCALCO, LLP**
Attorneys for the Chapter 11 Debtor

By:  Adam P. Wofse, Esq.
       Gary F. Herbst, Esq.

3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION (THE "PLAN") PROPOSED BY THE DEBTOR. NO OTHER REPRESENTATIONS CONCERNING THE DEBTOR, THE VALUE OF ITS ASSETS OR BENEFITS OFFERED UNDER THE PLAN HAVE BEEN AUTHORIZED.

THE APPROVAL OF THE DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS OF THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN. [BANKRUPTCY COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION ON THE MERITS OF THE PLAN.] A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT "1" AND DESCRIBED HEREIN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE WHICH ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION WHETHER TO APPROVE THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION; NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR AND FROM OTHER SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

# TABLE OF CONTENTS

Page

I INTRODUCTION ........................................................................................................... 1
   A.   Background .......................................................................................................... 1
   B.   The Plan Confirmation Process ......................................................................... 2

II SUMMARY OF PLAN ................................................................................................. 3
   A.   Summary of Categories of Claims .................................................................... 3
   B.   Summary of Plan Distributions ......................................................................... 7
   C.   Source of Information ........................................................................................ 9

III HISTORY OF THE CHAPTER 11 CASE .................................................................. 10
   A.   History of Case .................................................................................................. 10
   B.   Retention of Professionals ................................................................................. 21
   C.   Claims Bar Date ................................................................................................ 22

IV THE PLAN OF LIQUIDATION ................................................................................ 23
   A.   Explanation of Chapter 11 ................................................................................ 23
   B.   Claims ............................................................................................................... 23
   C.   Classes Of Claims or Interests .......................................................................... 24
        Unclassified Claims .......................................................................................... 24
            1.   Administrative Expenses .................................................................... 24
            2.   Fees and Expenses of United States Trustee ...................................... 25
            3.   Priority Tax Claims ............................................................................ 25
        Classified Claims .............................................................................................. 25
   D.   Treatment of Allowed Claims ........................................................................... 26

V IMPLEMENTATION OF THE PLAN ........................................................................ 30

VI FEASIBILITY .......................................................................................................... 31

VII CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
       EFFECTIVE DATE ........................................................................................... 32

VIII VOTING ................................................................................................................. 32

IX REQUIREMENT FOR CONFIRMATION OF THE PLAN ...................................... 33
   A.   Confirmation Hearing ....................................................................................... 33
   B.   Objections to Confirmation ............................................................................... 33
   C.   Acceptance of the Plan ...................................................................................... 33
   D.   Confirmation of Plan ......................................................................................... 34
   E.   Cramdown ......................................................................................................... 34

X   EFFECT OF CONFIRMATION; DISCHARGE OF DEBTS; INJUNCTION; RELEASE ... 35
   A.   Effect of Confirmation ................................................................................................. 35
   B.   Discharge of Debts ...................................................................................................... 35
   C.   Injunction ................................................................................................................... 35
   D.   Release ....................................................................................................................... 36

XI  ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS .......................... 38
   A.   Alternatives to the Plan .............................................................................................. 38
   B.   Best Interests of Unsecured Creditors ......................................................................... 40
   C.   Liquidation Analysis ................................................................................................... 41

XII  RECOMMENDATION OF THE DEBTOR ........................................................................ 42

XIII  ADDITIONAL INFORMATION ...................................................................................... 42

XIV  TAX CONSEQUENCES .................................................................................................. 43

XV  CONCLUSION ................................................................................................................. 43

# I

# INTRODUCTION

## A.  Background

Durr Mechanical Construction, Inc., the debtor (the "Debtor"), submits this Disclosure Statement (the "Disclosure Statement") pursuant to § 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), to the creditors of the Debtor (the "Creditors") in connection with the: (i) the Debtor's Plan of Liquidation dated September 12, 2019 (the "Plan"), proposed and filed by the Debtor with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and (ii) hearing on confirmation of the Plan to be scheduled by further notice and/or Order of the Bankruptcy Court.  Unless otherwise defined herein, all capitalized terms contained herein will have the meanings ascribed to them in the Plan.

Attached as an Exhibit to and accompanying this Disclosure Statement is a copy of the following:

Exhibit "1" - The Plan
Exhibit 2 = Budget/Projections
Exhibit 3 = Liquidation Analysis

BALLOTS ARE BEING PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS IN CLASSES 2, 3, 4 AND 5 BECAUSE CLASSES OF IMPAIRED CLAIMS ARE PERMITTED TO VOTE ON THE PLAN, WHEREAS CLASSES THAT ARE UNIMPAIRED ARE NOT ENTITLED TO VOTE AND ARE PRESUMED TO HAVE ACCEPTED THE PLAN.

**B.**     **The Plan Confirmation Process**

The Bankruptcy Court approved this Disclosure Statement as containing adequate information to permit creditors of the Debtor to make a reasonably informed decision in exercising their right to vote upon the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan. Each Creditor should read this Disclosure Statement and the Plan in their entirety.

Pursuant to various provisions of the Bankruptcy Code, only classes of claims that are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject such plan. Accordingly, pursuant to the Debtor's Plan, Classes of Claims and Interests 2, 3, 4 and 5 are entitled to vote.

In accordance with § 1128 of the Bankruptcy Code, the Bankruptcy Court shall schedule pursuant to separate notice or Order a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), in the Courtroom of the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom 723, One Bowling Green, New York, New York 10004-14081. Objections, if any, to confirmation of the Plan shall be served and electronically filed with the Bankruptcy Court in accordance with such further notice from and/or Order of the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned hearing date made at the Confirmation Hearing or at any subsequent adjourned date.

## II

## SUMMARY OF PLAN

The table below provides a summary of the classification and treatment of Claims under the Plan. The figures set forth in the table below represent the Debtor's best estimate of the total amount of Allowed Claims in the case. These estimates have been developed by the Debtor based upon (i) an analysis of its books and records; and (ii) filed proofs of claim. By Order of the Bankruptcy Court, April 15, 2019 was set as the last date for filing Proofs of Claim with the Clerk of the Bankruptcy Court. There can be no assurance that the amount of Claims that may be filed and allowed by the Bankruptcy Court will not exceed the amounts set forth or described herein. Nothing set forth in these schedules shall be deemed an admission by the Debtor as to the existence, validity, priority or amount of any claim asserted against the Debtor. The Debtor fully reserves all of its rights to object to claims, and certain claims are subject to dispute.

**A.** **Summary of Categories of Claims:**

| Class | Nature of Claims | Approximate Dollar Amount of Claims in Class |
|---|---|---|
| Unclassified – Administrative | Administrative claims including Professionals pursuant to application and Bankruptcy Court Order | Post-petition administrative claims of the Debtor's estate and the Liquidating Trust due in the ordinary course of the Debtor's business, as filed, in approx. aggregate sum of $312,000; <br><br> It is projected that the Debtor will incur and pay, subject to one or more Budgets approved by the |

| | | Secured Parties[1] (see Exhibit 2); ordinary course business expenses which include payroll (from September 7, 2019 through January 11, 2020) in the approx. sum of $747,150.00[2]

This class of claims includes, the outstanding principal amount of $250,000.00 (plus interest and legal fees) owed under the DIP Loan Agreement, and the rights of Zurich, pursuant to: (i) Final Order Pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 364 of the Bankruptcy Code Authorizing Post-Petition Secured Financing from Zurich American Insurance Company [Docket No. 159] (and any Order amending same); and (ii) Stipulation and Order Pursuant to 11 U.S.C. §§ 361 and 363, for Entry of Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to HSBC Bank USA, National Association, Valley National Bank, and the Internal Revenue Service and (III) Granting Related Relief [Docket No. 160] (and any Order amending same). |
|---|---|---|

[1] Per the Plan, the Secured Parties are HSBC Bank USA, National Association, Valley National Bank, Zurich American Insurance Company and its subsidiaries and affiliates, including but not limited to, Fidelity and Deposit Company of Maryland, and the Internal Revenue Service.

[2] After January 2020, Debtor anticipates actively achieving reductions in operating and administrative costs, as warranted, based upon the circumstances of the case.

| | | LaMonica Herbst & Maniscalco, LLP, General Bankruptcy Counsel to the Debtor and Grassi & Co., financial advisor to the Debtor, anticipate professional fees to be incurred through January 11, 2020 in the aggregate amount of $1.1 million (of which approx. $616,000 has been paid on an interim basis pursuant to Bankruptcy Court Order dated July 24, 2019 (the "First Fee Order") [Docket No. 287] |
| | | Additional professional fees are to subsequently be paid upon separate application and Bankruptcy Court approval, as may be necessary, and except as provided for in the Liquidating Trust, by a carve out, which includes from the Affirmative Claims recoveries. |
| | | **Affirmative Claims special counsel:** |
| | | Shipman & Goodwin, LLP ("S&G"), Special Connecticut Litigation Counsel, is owed approx. $10,000 as of the date of the Plan, which is subject to fee application and Bankruptcy Court Order. Interim fees in the approximate amount of $38,000 were paid to S&G pursuant to the First Fee Order from its carve out from the Enexio Arbitration recovery. |
| | | Schiff Hardin LLP was paid final fees and expenses in the approx. sum of $3.5 million, |

| | | |
|---|---|---|
| | | pursuant to the First Fee Order on a final basis, pursuant to its carve out from the Enexio Arbitration recovery.<br><br>Peckar & Abramson, P.C., in accordance with its contingency fee agreement shall be paid from and upon recovery only of the PSEG Affirmative Claim, subject to fee application and Bankruptcy Court Order;<br><br>Cullen and Dykman LLP, in accordance with its contingency fee agreement shall be paid from and upon recovery only of the NYC-DEP Affirmative Claim, subject to fee application and Bankruptcy Court Order. |
| Unclassified – U.S. Trustee | Office of the United States Trustee | Unknown |
| Unclassified – Priority Tax Claims | Priority Tax Claims pursuant to 11 U.S.C. § 507(a)(8) | Pre-petition priority tax claims filed against the Debtor's estate are in the approximate aggregate sum of $624,545.21. |
| Class 1 | Construction Trust Fund and/or Equivalent Claims | Approx. $22.0 million.<br><br>Note: There is likely substantial duplication of claims with Class 2 claims (which will be reviewed and resolved by the Debtor as part of the claims allowance and disallowance process). |
| Class 2 | Secured Claims | Secured claims as filed in the aggregate approximate sum of $43,520,000, which include, the Secured Parties (as defined herein and in the Plan). |
| Class 3 | Priority (Non-Tax) Claims | Pre-petition priority, non-tax claims filed against the Debtor's estate are in the approximate aggregate sum of $223,218.55. |

| | | |
|---|---|---|
| Class 4 | General Unsecured Claims | General unsecured pre-petition claims filed against the Debtor's estate are in the approximate aggregate sum $32,396,042.17.<br><br>Note: Debtor disputes a substantial amount of these claims (based upon duplication, overlap with other claims, and the availability of insurance, which will be reviewed and resolved by the Debtor as part of the claims allowance and disallowance process). |
| Class 5 | Interests | Shareholders of the Debtor |

**B.**     **Summary of Plan Distributions:**

A summary description of each class of Claims and the treatment of such Claims is set forth below:

| Class Description | Treatment |
|---|---|
| **Unclassified: Administrative Claims** | On or as soon as practicable after the Effective Date, from and to the extent of Available Funds, in accordance with the Liquidating Trust, Administrative Claims will be paid, in full in the ordinary course of business, or as otherwise agreed with the creditor.<br><br>Debtor's Professionals' Claims, upon subsequent application and Bankruptcy Court approval, will be paid as agreed with each professional, upon the recovery from the respective Affirmative Claims and Available Funds. |
| **Unclassified: U.S. Trustee** | Any fees and applicable interest due to the United States Trustee shall be paid in full on the Effective Date. Fees and any applicable interest due to the United States Trustee through the earlier of a final decree, dismissal or conversion of this case, shall be paid each calendar quarter by the Debtor. |

| | |
|---|---|
| **Unclassified: Priority Tax Claims** | Allowed Priority Tax Claims of governmental units, if any, will be paid, in accordance with Section 1129(a)(9)(C). |
| **Class 1: Construction Trust Fund and/or Equivalent Claims** | On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 1 Claim shall receive in full, final and complete satisfaction, settlement, release and discharge of such Claim, payment in full of the Allowed Class 1 Claim, or subsequent payment of such Allowed Class 1 Claim, in the ordinary course of business, each in accordance with the provisions of applicable non-bankruptcy law and such agreements and terms as existing as of the Filing Date, which agreements will continue in full force and effect. |
| **Class 2: Secured Claims** | On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 2 Claim, to the extent of the value of such Holder's collateral and in accordance with the priorities under the Bankruptcy Code and applicable non-bankruptcy law, shall receive in full, final and complete satisfaction, settlement, release and discharge of such Claim, payment in full of the Allowed Class 2 Claim, or as otherwise agreed with the creditor. Allowed Class 2 Claims shall be paid from Available Funds, subordinate and subject to approved carve outs, reserves and/or operating funds[3] for (i) the U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses (including any of his Professionals or the Debtor's employees as set forth herein) in connection with the Liquidating Trust. |
| **Class 3: Priority (Non-Tax) Claims:** | On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 3 Claim, and in accordance with the priorities under the Bankruptcy Code, shall receive in full, final and |

---

[3] Operating funds shall be used in accordance with one or more cash collateral Orders approved by the Bankruptcy Court, or as otherwise agreed and extended in writing among the Secured Parties, in accordance with one or more approved Budgets without the necessity of further Bankruptcy Court Order.

| | |
|---|---|
| | complete satisfaction, settlement, release and discharge of such Claim, payment in full of the Allowed Class 3 Claim. Allowed Class 3 Claims shall be paid from Available Funds, subordinate and subject to approved carve outs, reserves and/or operating funds for (i) the U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses (including any of his Professionals or the Debtor's employees as set forth herein) in connection with the Liquidating Trust, and after payment in full of allowed Administrative Expense Claims, and Allowed Claims in Class 2, except as otherwise agreed with the holder of such Claims. |
| **Class 4: Unsecured Claims** | As soon as reasonably practicable after receipt from the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, and after the date upon which all objections to Class 4 General Unsecured Claims have been resolved or adjudicated by the Bankruptcy Court, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 4 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, its Pro Rata Share of Available Funds, subordinate and subject to approved carve outs, reserves and/or operating funds (see footnote 2) for (i) the U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses (including any of his Professionals or the Debtor's employees as set forth herein) in connection with the Liquidating Trust, and after payment in full of allowed Administrative Expense Claims, Allowed Claims in Class 2, Allowed Priority Tax Claims and Allowed Claims in Class 3, except as otherwise agreed with the holder of such Claims. |
| **Class 5: Interests**<br>This class consists of the shareholder interests of the Debtor. | The shareholders of the Debtor shall not retain their shareholder interests. Class 5 Interests will only receive Pro Rata Distributions under the Plan and/or the Liquidating Trust, in the event that all senior classes of Allowed Claims have been paid in full. In such event such Pro Rata Distributions shall be paid as soon as reasonably practicable after receipt from the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds. |

## C.      Source of Information

The information contained in this Disclosure Statement was prepared by the management

of the Debtor, based upon the Debtor's books and records, the Debtor's bankruptcy petition and

schedules, and preliminary review of all proofs of claim timely filed with the Bankruptcy Court. The estimates of Claims set forth herein may vary from the final amount of Claims allowed by the Bankruptcy Court, however, the Debtor believes that the numbers and dollar amounts reflected herein are reasonably accurate according to currently filed claims and scheduled debts of creditors that have not filed a proof of claim. While every effort has been made to ensure the accuracy of all such information, the information presented herein is unaudited and has not been examined, reviewed, or compiled by an independent public accountant.

**III**

**HISTORY OF THE CHAPTER 11 CASE**

**A.**     **History of Case**

**The Debtor's Business Operations**

The Debtor is a New York corporation founded in 1985 as a small family-owned mechanical construction business by Robert Durr, Sr. Since Robert Durr, Sr.'s retirement in 2012, the Debtor has been run by Kenneth A. Durr and Robert Durr, Jr. The Debtor's ownership structure consists of 1000 shares of stock, broken down as follows: (a) 900 shares of non-voting stock which is distributed among: (i) Robert Durr, Jr. who owns 423 shares; (ii) Kenneth A. Durr who owns 423 shares and (iii) Frank Heidinger who owns 54 shares; and (b) 100 shares of voting stock which is distributed among: (i) Robert Durr, Jr. who owns 45 shares; (ii) Kenneth A. Durr who owns 45 shares and (iii) Robert Durr, Sr. who owns 10 shares.

The Debtor is and was a leader and innovator in the mechanical construction industry. Its work involves installation, rigging, setting, assembly, alignment and grouting of assorted process and power equipment including electric or steam driven compressors, ACC's, HRSG's, turbines, pumps, heat exchangers, boilers, tanks, heaters and packaged HVAC systems. The Debtor's

work scope also includes the installation and testing of instruments, controls and apparatus associated with power and process systems. It distinguishes itself with an in-house quality assurance program and has capabilities that have been demonstrated and approved by both the American Society of Mechanical Engineers (ASME) and the National Board of Boiler and Pressure Vessel Inspectors. The Debtor has been issued "U", "R", "NB" and "S" stamps indicating the Debtor's authorization to perform repair, manufacture and assemble boiler and pressure vessels.

Throughout 2018, the Debtor worked on over fifty small to large size projects which resulted in revenues in excess of twenty million dollars. During 2016, The Debtor's total sales exceeded $54,600,000 and during 2017, the Debtor's gross sales exceeded $197,860,000. In its thirty-two (32) year history in the mechanical construction business, the Debtor generated gross sales which exceeded $1,392,000,000, which has resulted in gross profits of over $130,787,000.

**Events Leading to the Chapter 11 Filing**

The Debtor can trace the source of its pre-petition financial difficulties to the following circumstances, which stemmed from three (3) particular projects.

The Debtor, being a leader in the mechanical industry, serviced many large-scale projects. The Debtor experienced severe cash flow issues primarily as a result of the refusals of the two owners and one equipment manufacturer of three projects to timely pay amounts due and owing to the Debtor in connection with those projects. Specifically, the equipment manufacturer and owners who failed to pay pre-petition are (a) Enexio US LLC ("Enexio"), (b) PSEG Fossil, LLC ("PSEG"), and (c) the New York City Department of Environmental Protection ("NYC-DEP") (collectively, Enexio, PSEG and NYC-DEP, the "Obligors"). As of the Filing Date, the aggregate sum due to the Debtor from these projects (and affirmative claims for damages as

further set forth below) exceeded $122 million. As of the Filing Date, the Enexio and PSEG projects were 100% complete and the NYC-DEP project was 98% complete (now 99.8% complete).

Pre-petition, the Debtor's cash flow problems negatively affected its operations because certain subcontractors, vendors and/or creditors (a) filed liens against projects, (b) filed claims against payment bonds, and/or (c) commenced litigation against the Debtor for nonpayment, all of which further exacerbated the Debtor's distressed financial situation. In November 2018, the Debtor, without sufficient cash flow, began to wind down all projects, which included the completion, termination and/or transfer of some projects, and the Debtor stopped soliciting new work.

The Debtor was ultimately compelled to file its Chapter 11 petition in order to (a) afford itself of the protections under the Bankruptcy Code and grant the Debtor a breathing spell from a multitude of adverse creditor actions, and (b) protect the extremely valuable affirmative litigation claims (the Original Affirmative Claims, as defined below), which the Debtor had against the multiple Obligors, as set forth more fully below.

**<u>Operations as a Debtor in Possession</u>**

Since the Chapter 11 filing, the Debtor stabilized its business, continued its wind down efforts, closed out and finished jobs, discontinued and transferred other jobs, and continued the prosecution of the extremely valuable Original Affirmative Claims (defined below). Early in the Chapter 11 case, the Debtor and Zurich negotiated and entered a DIP loan agreement, which was

approved by the Bankruptcy Court, in the amount of $750,000.00[4], in order to provide critical funds necessary for the Debtor's continued operations and prosecution of the valuable Original Affirmative Claims.

The Debtor is presently providing services on one remaining on-going construction project in the New York metropolitan area.

The Debtor's assets, separate and apart from the Affirmative Claims (as discussed more fully herein), are nominal. The Debtor presently has a total of approximately $260,000 (reasonably collectable) accounts receivable due from various project owners and general contractors.[5]

Presently, the Debtor has thirteen (13) employees, comprised as follows: ten (10) full time and one (1) part time employee in field management and home office executive and support staff; and two (2) construction workers on the Debtor's one remaining project.

The Debtor operates its business from its one remaining rented location in Tannersville, Pennsylvania.[6]

It was by virtue of this Chapter 11 proceeding and the Debtor's implemented strategy that the considerably valuable Enexio arbitration award (one of the Original Affirmative Claims), in

---

[4] Pursuant to the Second Stipulation and Order Amending and Modifying Cash Collateral Stipulation and Final Order, Zurich has been repaid the sum of $554,269.27 representing $500,000 of principal, plus interest and legal fees.

[5] These receivables are in addition to the remaining Affirmative Claims in excess of $110 million set forth and discussed more fully herein.

[6] Prior to and for a short period following the Filing Date, the Debtor operated from three locations: 80 8th Avenue, New York, New York was the Debtor's principal office, with shop and storage facilities in Westbury, New York and the current Tannersville, Pennsylvania location (the latter being the Debtor's current home office).

excess of $10.9 million, was able to be realized for the benefit of the Debtor's estate and creditors, as explained more fully below.

**The Debtor's Original Affirmative Claims and Pending Affirmative Claims**

As stated, as of the Filing Date, the Debtor possessed multiple, extremely valuable affirmative claims (the "Original Affirmative Claims") against the aforementioned Obligors. As indicated above, the aggregate total of the Original Affirmative Claims exceeded $122 million.

A.   **Enexio**

On or about November 14, 2017, the Debtor filed a demand for arbitration against Enexio with the American Arbitration Association, Case No. 01-17-0006-9347, seeking to recover sums totaling $15,230,333.85 arising out of a project for construction of the air cooled condensers at the CPV Towantic Energy Center, a 785 megawatt natural gas-fueled combined-cycle electric generating facility in Oxford, Connecticut (the "Arbitration"). Schiff Hardin LLP and Shipman & Goodwin LLP represented the Debtor in this action and related proceedings. Immediately upon the filing of the Chapter 11 case, the Debtor moved by expedited motion and obtained an Order lifting the stay to enable the Arbitration to proceed uninterrupted.

The Arbitration case against Enexio concluded, and an award (the "Arbitration Award") in favor of the Debtor was issued by the arbitration panel on April 24, 2019, in the total amount of $9,590,433.15, plus certain applicable interest and costs. The Enexio award funds were indeed received by the Debtor, on or about June 18, 2019, in the total sum of $10,902,434.21. As set forth in prior pleadings and proceedings held in this case, the receipt of the Arbitration Award would provide, and has provided, the Debtor with indispensable additional financial support and allowed for payment of certain secured claims and other debts (including

contingency fees to special counsel and other interim fees to Debtor's professionals)[7]. Thereafter, the approximate sum of $2.1 million would be potentially left for the Debtor's continued operations and judicious prosecution of the remaining Affirmative Claims, which seek recoveries for damages in the approximate aggregate sum of $110 million.

B.  **PSEG**

In relation to one of the Debtor's prepetition large-scale projects, prior to the Filing Date, on or about June 15, 2018 the Debtor filed a complaint against PSEG, captioned Durr Mechanical Construction, Inc. v. PSEG Fossil, LLC, Civil action number 18-CV-10675 (KM) (CW), in the United States District Court for the District of New Jersey, seeking to recover the aggregate amount of approximately $93,218,512.35 (the "PSEG Litigation").  Peckar & Abramson, P.C. represents the Debtor in this action concerning this Affirmative Claim.  Shortly after the commencement of the suit, the action was suspended while the parties engaged in mediation proceedings, which remains ongoing.

Specifically, the Debtor's claims asserted in the PSEG Litigation relate to Debtor's work, as a mechanical piping contractor, for the construction of the new Sewaren 7 Combined Cycle Power Plant in Woodbridge, New Jersey, built for the Defendant, PSEG Fossil, LLC ("PSEG"). Note that some of the pre-assembly construction work for the Sewaren 7 plant (especially for the Heat Recovery Steam Generator (HRSG) and the Air Cooled Condenser (ACC)) took place off site at Coeymans in upstate New York.  In connection with the PSEG Litigation, the Debtor asserted breach of contract and quantum meruit claims against PSEG totaling over $36 million (including nonpayment of $18 million in previously approved invoices) and $18 million in

---

[7] In accordance with the Second Stipulation and Order Amending and Modifying Cash Collateral Stipulation and Final Order.

outstanding change orders. Additionally, the Debtor asserted against PSEG claims for misrepresentation, breach of the covenant of good faith and fair dealing, bad faith, interference with contract, and interference with prospective business advantage causes of action totaling an additional $56 million in damages.

Significantly, as indicated above, mediation of the PSEG Litigation is presently active and ongoing, with written submissions requested by the mediator having been submitted in June and July 2019. Additional mediation sessions with the parties are tentatively scheduled for mid-October 2019. In the event the mediation proves successful, then the PSEG Litigation will be discontinued. However, if the mediation is unsuccessful in fully resolving the suit and claims, then the litigation will proceed. To date, only the complaint was filed in the action. An answer has not yet been filed by PSEG. Shortly after the filing of the complaint, the parties suspended the action while they engaged in mediation proceedings.

It is important for all interested parties to note that PSEG, through counsel, orally represented to the Bankruptcy Court (at the first day hearings held in this case on December 12, 2018) that PSEG held asserted counterclaims (unsubstantiated to date) against the Debtor which exceeded the claims for damages sought by the Debtor against PSEG in the PSEG Litigation. Specifically, counsel for PSEG alleged and stated on the record at the first day hearings that the Debtor would ultimately receive no affirmative recovery against PSEG, but rather, PSEG would be owed monies by (have a claim against) the Debtor's estate.

Notwithstanding the unsubstantiated allegations of PSEG, PSEG could not, under any circumstance, have a net recovery against the Debtor's estate because PSEG failed to timely and properly file and assert its counterclaim as a proof of claim in this bankruptcy case.

By virtue of the Bankruptcy Court's bar date Order dated and entered February 25, 2019 (the "Bar Date Order")[Docket No. 162], which established April 15, 2019 (the "Bar Date"), as the date by which any asserted creditor of the Debtor's estate was required to file its proof of claim with the Bankruptcy Court, the failure to so file such a claim barred any such asserted creditor from receiving any distribution in this bankruptcy case.  Specifically, the Bar Date Order provides:  "pursuant to Bankruptcy Rule 3003(c)(2), all holders of claims that fail to comply with this Order by timely filing a proof of claim in appropriate form shall not be treated as a creditor with respect to such claim for the purposes of voting and receiving a distribution in this case."

Furthermore, the Notice of the Bar Date (the "Notice"), which was approved by and served along with the Bar Date Order upon all creditors, including PSEG, contained a notice and warning to any holder of a claim against the Debtor of the consequences of the failure to file a proof of claim by the Bar Date.  Specifically, the Notice stated that any holder of a claim that failed to timely file a proof of claim in appropriate form "shall not be treated as a creditor with respect to such claim for the purposes of voting on any Plan of [Liquidation] filed in this case and participating in any distribution in the Debtor's Chapter 11 case on account of such claim." Moreover, no other Order of the Bankruptcy Court excused the obligation of PSEG to file a proof of claim in this case.

Accordingly, any previously asserted counterclaim of PSEG against the Debtor, which may have existed as of the Filing Date, is a nullity and of no force or effect.

Therefore, if the mediation is not successful in fully resolving the PSEG Litigation, and because the PSEG counterclaim is a nullity as addressed above, the Debtor anticipates to affirmatively recover on this Affirmative Claim against PSEG, via the continued litigation.  Such

recovery may include the substantial demanded sum of not less than $92 million, as set forth above, for the benefit of the Debtor's estate and creditors.

C.    **NYC-DEP**

In relation to another one of the Debtor's prepetition large-scale projects, prior to the Filing Date, the Debtor has pursued a recovery on certain affirmative claims against the City of New York, acting by and through the New York City Department of Environmental Protection ("DEP"), arising out of Contract CRO-312 for the project known as the Croton Water Treatment Plant located at Van Cortlandt Park, Bronx, New York (the "DEP Project"). Cullen and Dykman LLP represents the Debtor in connection with this Affirmative Claim. Since the Filing Date, the Debtor has engaged in extensive discovery with DEP regarding the City's alleged defenses to the Debtor's claims and anticipates filing an adversary proceeding against the City to recover on this Affirmative Claim in the coming months.

Specifically, the Debtor asserts claims against DEP relating to the Debtor's work, as the "H" prime contractor, to procure, install, and startup a complete HVAC system for the water treatment facility owned and operated by the DEP.

As a consequence of impacts to the Debtor's work on the DEP Project due to uncontemplated events beyond its control, the Debtor incurred a delay damages claim against DEP in the amount of not less than $15,687,321, as of July 31, 2019, together with statutory interest thereon. This claim continues to accrue due to DEP's improper refusal to declare "substantial completion" of the Debtor's work under the contract where the plant has been in operation since May 2015, and was approved as complete by the New York State Department of Health, effective June 10, 2016.

D. **IK**

On June 4, 2014, the Debtor entered into a general contract with Covanta Essex Company to provide construction management and other services relating to the Essex Baghouse Project (the "Baghouse Project"). In connection with the Baghouse Project, on August 13, 2014, the Debtor entered into a subcontract (the "IK Subcontract") with IK for IK to perform all steel fabrication and erection at the Baghouse Project. Due to IK's various breaches under the terms of the IK Subcontract, on February 18, 2016 the Debtor sent IK a three-day notice stating that if the various breaches under the IK Subcontract were not cured, the Debtor would take corrective action, including terminating the IK Subcontract. When IK failed to cure, on March 2, 2016, the Debtor sent a letter officially terminating the IK Subcontract. Subsequently, the Debtor took corrective action to complete the work required under the IK Subcontract, which resulted in actual costs to the Debtor of $1,305,614 ("Debtor's Damage Claim").

On May 1, 2016, and following the termination of the Subcontract, IK filed a bond claim against the payment bond[8] issued by Zurich[9] in connection with the Baghouse Project asserting unpaid amounts allegedly owed by the Debtor to IK for retainage of $489,729.00, change orders of $395,364.80, and an amount to be calculated for contract payments, which after an inquiry from Zurich, IK provided a breakdown of its claim which totaled $1,249,687.35. On February 20, 2017, IK filed an amended bond claim, which revised and increased IK's total claim against the bond (for monies allegedly owed by the Debtor to IK) to $1,924,128.00 ("Amended Bond

---

[8] In accordance with an indemnity agreement between the Debtor and Zurich, the Debtor is obligated to indemnify Zurich for all losses under the bond, and such indemnification claim held by Zurich against the Debtor is a secured claim by virtue of the applicable security agreement and UCC-1 filing.

[9] As defined in the Plan, Zurich includes its affiliate Fidelity.

Claim").

On February 24, 2017, IK filed an action in the Superior Court of New Jersey, Law Division, Essex County ("Superior Court") entitled, *I.K. Construction Company, Inc. v. Durr Mechanical Construction Inc., Port Authority of New York and New Jersey, Covanta Essex Company, Covanta Energy Company, Fidelity & Deposit Company of Maryland, Zurich North America, Corporations A, B, C and D, and Corporations E and F*, Docket No. ESX-L-1490-17 (the "New Jersey Litigation"). The New Jersey Litigation sought damages in the amount asserted in the Amended Bond Claim and the Debtor asserted a counterclaim in the amount of the Debtor Damage Claim.

Subsequent to the Filing Date, the Superior Court issued an order on December 14, 2018 ("Disposition Order") which addressed the Debtor's bankruptcy and provided that any party making a claim against the Debtor was required to file a formal application, in the Bankruptcy Court, seeking relief from the automatic stay, within thirty days in order to continue the New Jersey Litigation against the Debtor. IK failed to seek relief from the automatic stay, and accordingly, the Debtor was administratively dismissed from the New Jersey Litigation, however IK's cause of action against Fidelity remained.

On July 2, 2019, the Debtor commenced an adversary proceeding against IK ("IK Adversary Proceeding") which sought declaratory and/or injunctive relief against IK to obtain an extension of the automatic stay to enjoin the New Jersey Litigation against Zurich and Fidelity, money damages on the Debtor's Affirmative Claim relating to the breach of the Subcontract and an objection to IK's proof of claim filed on March 7, 2019 (the "IK Proof of Claim").

On August 12, 2019, the Bankruptcy Court issued a Decision, which determined in part that the continuation of the New Jersey Litigation against Fidelity would have an immediate,

adverse economic impact on the Debtor's estate and its creditors, and the New Jersey Litigation was therefore enjoined from proceeding. An Order of the Bankruptcy Court staying the New Jersey Litigation was entered consistent with the Decision.

Debtor is presently pursuing the remainder of its claims against IK, including but not limited to the Debtor's Damage Claim (the approximate $1.3 million) and objection to the IK Proof of Claim in the context of the IK Adversary Proceeding.


As mentioned above, given the extraordinary failure and refusal of the Obligors (together with the cumulative effect thereof relating to other obligors) to pay their obligations to the Debtor, the Debtor was forced into a distressed financial situation and constrained to reorganize via an orderly liquidation, in order to protect, preserve and maximize the value of the Debtor's assets—essentially, the Original Affirmative Claims—for the benefit of the Debtor's estate and its creditors. It is the monetary recoveries to be achieved via the remaining Affirmative Claims which form the basis for the proposed Plan and the Liquidation Trust.

**B.    Retention of Professionals**

As of the Filing Date, the Debtor employed LaMonica Herbst & Maniscalco, LLP ("LHM") as general bankruptcy counsel to the Debtor. By Order dated January 7, 2019, the Bankruptcy Court authorized the Debtor's employment of LHM.

As of the Filing Date, the Debtor employed Grassi & Co. ("Grassi") as financial advisor to the Debtor. By Order dated January 8, 2019, the Bankruptcy Court authorized the Debtor's employment of Grassi.

As of the Filing Date, the Debtor employed Schiff Hardin LLP ("Schiff") in connection with the Enexio Arbitration. By Order dated December 21, 2018, the Bankruptcy Court

authorized the Debtor's employment of Schiff as special construction litigation counsel to the Debtor.

As of the Filing Date, the Debtor employed Peckar & Abramson, P.C. ("P&A") in connection with the PSEG Litigation. By Order dated January 7, 2019, the Bankruptcy Court authorized the Debtor's employment of P&A as special construction litigation counsel to the Debtor.

As of the Filing Date, the Debtor employed Shipman & Goodwin LLP ("S&G") in connection with the Enexio Arbitration. By Order dated January 8, 2019, the Bankruptcy Court authorized the Debtor's employment of S&G as special Connecticut construction litigation counsel to the Debtor.

As of the Filing Date, the Debtor employed Cullen and Dykman LLP ("C&D") in connection with the DEP claims. By Order dated January 16, 2019, the Bankruptcy Court authorized the Debtor's employment of C&D as special construction litigation counsel to the Debtor.

## C.    Claims Bar Date

By the Bar Date Order, the Bankruptcy Court fixed April 15, 2019 as the Bar Date, which is the date by which creditors must have filed a proof of claim ("Proof of Claim") in this case. Accordingly, any Creditor having filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, and whose Claim is deemed an Allowed Claim, will receive payment, if any, in accordance with the terms of the Plan and the Liquidating Trust. In accordance with the Bar Date Order, any Creditor who failed to file a Proof of Claim on or before the Bar Date, i.e. April 15, 2019, which is not listed on the Debtor's Schedules or is listed as "disputed," "contingent" or

"unliquidated" on the Debtor's Schedules, will not be treated as a creditor for the purposes of voting and receiving a distribution under the Plan (and/or Liquidating Trust) in this case.

## IV

## THE PLAN OF LIQUIDATION

### A.      Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.   Under Chapter 11, a debtor seeks to reorganize its business and financial affairs.  A debtor may also liquidate its assets and wind up its affairs in Chapter 11.  The formulation and confirmation of a plan of reorganization or liquidation is the principal purpose of a Chapter 11 case.  A plan of liquidation sets forth the means of satisfying or discharging the holders of claims against a Chapter 11 debtor.  Chapter 11 does not require that each holder of a claim against a debtor vote in favor of a plan in order for the Bankruptcy Court to approve a plan.  If any class of claimants is "impaired" by a plan, the plan must be accepted by at least one "impaired" class of claims.  A claim that will not be repaid in full, or a Claimant whose legal rights are altered, or an interest that is adversely affected, are deemed "impaired."

The holder of an impaired claim is entitled to vote to accept or reject the plan if the claim has been allowed under § 502 of the Bankruptcy Code, or temporarily allowed for voting purposes under Rule 3018 of the Federal Rules of Bankruptcy Procedure.  Acceptance by a particular class must be by a majority in number and two-thirds (2/3) of the dollar amount of the total claims actually voting in the class.

### B.      Claims

Pursuant to the Bar Date Order, any creditor who failed to file a proof of Claim on or before the Bar Date and was not listed on the Schedules, or was listed as "disputed,"

"contingent" or "unliquidated", cannot be treated as a creditor with respect to such Claim for purposes of voting on and receiving a Distribution under the Plan (or the Liquidating Trust) in this case.

All Proofs of Claim filed in this case will be reviewed, and to the extent necessary, the Debtor and/or the Liquidating Trustee will file objections to certain filed claims. The Bankruptcy Court will retain jurisdiction to adjudicate objections to claims brought by the Debtor and/or the Liquidating Trustee, including any settlements or compromises of such claims. The Debtor reserves all of its and the Liquidating Trustee's rights to object to Claims.

**C.      Classes Of Claims or Interests**

**Unclassified Claims**

**1.      Administrative Expenses:**  Allowed Administrative Expense Claims are claims against the estate for any costs or expenses incurred during the Chapter 11 case that are allowed and entitled to priority under §§ 503(b) and 507(a)(1) of the Bankruptcy Code, including, but not limited to, all actual and necessary expenses, and all allowances of compensation or reimbursement of expenses of professionals retained by the Debtor to the extent permitted by the Bankruptcy Court.

Administrative Claims include claims of Professionals approved by Order of the Bankruptcy Court who have assisted in the administration of this case and the administrative proofs of claims that were filed with the Bankruptcy Court. This sum includes the fees and expenses of professionals retained pursuant to Orders of the Bankruptcy Court: Debtor's counsel, Debtor's various special counsel, and the Debtor's financial advisor. All such professional fees are subject to Bankruptcy Court approval.

2.      **Fees and Expenses of United States Trustee:**  The Debtor shall pay all statutory quarterly fees and any applicable interest due to the Office of the United States Trustee that come due through and including the date of the earlier of the entry of a final decree closing this Chapter 11 proceeding, or dismissal or conversion of this case.

3.      **Priority Tax Claims:**  Allowed Priority Tax Claims of governmental units that are entitled to priority in payment over Allowed Unsecured Claims pursuant to section 507(a)(8) of the Bankruptcy Code.

<u>**Classified Claims**</u>

Class 1 Claims – Construction Trust Fund and/or Equivalent Claims:  Class 1 consists of the Allowed Construction Trust Fund and/or Equivalent Claims of unpaid subcontractors, suppliers and/or materialmen in relation to the construction projects of the Debtor, including without limitation, such Claims of unpaid subcontractors, suppliers and/or materialmen, or Zurich as surety, to the extent paid by Zurich, pursuant to Final Order Pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 364 of the Bankruptcy Code Authorizing Post-Petition Secured Financing From Zurich American Insurance Company [Docket No. 159], and the Debtor in Possession Loan Agreement and Joint Prosecution Agreement (the "Loan Agreement") approved thereby, which provides in Section 24 thereof, as consented to by the Secured Banks (defined as Secured Creditors in the Loan Agreement), for the subordination of the liens or interests of the Secured Banks to the Claims of such unpaid subcontractors, suppliers and/or materialmen relating to the PSEG litigation and claim proceeds.

Class 2 Claims – Secured Claims:  Class 2 consists of the Allowed Secured Claims of Zurich, the Secured Banks, the IRS, and New York State in the order of priority of such secured liens and to the extent of the value of the collateral.

Class 3 Claims – Priority (Non-Tax) Claims: Class 3 consists of the Allowed priority Claims of employees (relating to expenses and benefits).

Class 4 Claims – General Unsecured Claims: Class 4 consists of Allowed Unsecured Claims.

Class 5 – Interests – Class 5 consists of the shareholder interests of the Debtor.

**D.**     **Treatment of Allowed Claims**

Allowed Administrative Expense Claims

Administrative Expense Claims are unimpaired. On or as soon as practicable after the Effective Date, in accordance with the Liquidating Trust, Administrative Claims will be paid in full in the ordinary course of business, from and to the extent of Available Funds, or as otherwise agreed with the creditor.

Debtor's Professionals' Claims, upon subsequent application and Bankruptcy Court approval, as may be required or necessary, will be paid as agreed with each professional, upon the recovery from the respective Affirmative Claims and Available Funds.

In the event of any subsequent conversion of this case to a case under Chapter 7 of the Bankruptcy Code, all payments on account of any Allowed Administrative Expense Claim are deemed to have been made in the ordinary course of the Debtor's business and will not be deemed preferential or unauthorized under sections 547 or 549 of the Bankruptcy Code. Holders of Administrative Expense Claims are not entitled to vote on the Plan and are deemed to have accepted the Plan.

Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor will be paid by the Debtor from and to the extent of Available Funds either (a) in accordance with the terms and conditions of the arrangements with the

particular creditor and in accordance with ordinary business terms, (b) on the Effective Date, or as soon as practicable thereafter upon receipt of the invoices for such liabilities, or (c) as otherwise agreed with such creditor.

United States Trustee Claims

The United States Trustee claims are unimpaired. The Debtor will pay all statutory fees and applicable interest due to the Office of the United States Trustee that come due through and including the earlier of the date of the entry of a final decree closing this Chapter 11 proceeding, or dismissal or conversion of this case.

Priority Tax Claims

Priority Tax Claims are unimpaired. Allowed Priority Tax Claims of governmental units, if any, will be paid in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, from and to the extent of Available Funds and in accordance with the Liquidating Trust.

Class 1 Claims – Construction Trust and/or Equivalent Claims

On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 1 Claim shall receive in full, final and complete satisfaction, settlement, release and discharge of such Claim, payment in full of the Allowed Class 1 Claim, or subsequent payment of such Allowed Class 1 Claim, in the ordinary course of business, each in accordance with the provisions of applicable non-bankruptcy law and such agreements and terms as existing as of the Filing Date, which agreements will continue in full force and effect. Class 1 Claims are unimpaired.

Class 2 Claims – Secured Claims:

On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 2 Claim, to the extent of the value of such Holder's collateral and in accordance with the priorities under the Bankruptcy Code and applicable non-bankruptcy law, shall receive in full, final and complete satisfaction, settlement, release and discharge of such Claim, payment in full of the Allowed Class 2 Claim, or as otherwise agreed with the creditor. Allowed Class 2 Claims shall be paid from Available Funds, subordinate and subject to approved carve outs, reserves and/or operating funds[10] for (i) the U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses (including any of his Professionals or the Debtor's employees as set forth herein) in connection with the Liquidating Trust. Class 2 Claims are impaired.

Class 3 Claims – Priority Claims:

On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 3 Claim, and in accordance with the priorities under the Bankruptcy Code, shall receive in full, final and complete satisfaction, settlement, release and discharge of such Claim, payment in full of the Allowed Class 3 Claim. Allowed Class 3 Claims shall be paid from Available Funds, subordinate and subject to approved carve outs, reserves and/or operating funds for (i) the U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses

---

[10] Operating funds shall be used in accordance with one or more cash collateral Orders approved by the Bankruptcy Court, or as otherwise agreed and extended in writing among the Secured Parties, in accordance with one or more approved Budgets without the necessity of further Bankruptcy Court Order.

(including any of his Professionals or the Debtor's employees as set forth herein) in connection with the Liquidating Trust, and after payment in full of allowed Administrative Expense Claims, and Allowed Claims in Class 2, except as otherwise agreed with the holder of such Claims. Class 3 Claims are impaired.

Class 4 Claims – General Unsecured Claims:

As soon as reasonably practicable after receipt from the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, and after the date upon which all objections to Class 4 General Unsecured Claims have been resolved or adjudicated by the Bankruptcy Court, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 4 Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, its Pro Rata Share of Available Funds, subordinate and subject to approved carve outs, reserves and/or operating funds (see footnote 2) for (i) the U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses (including any of his Professionals or the Debtor's employees as set forth herein) in connection with the Liquidating Trust, and after payment in full of allowed Administrative Expense Claims, Allowed Claims in Class 2, Allowed Priority Tax Claims and Allowed Claims in Class 3, except as otherwise agreed with the holder of such Claims. Class 4 Claims are impaired.

Class 5 – Interests: Class 5 Interests consist of the shares of the Debtor held by Kenneth A. Durr, Robert Durr, Jr., Frank Heidinger and Robert Durr, Sr. The foregoing shareholders shall not retain the Class 5 Interests under the Plan. Class 5 Interests will only receive Pro Rata Distributions under the Plan and/or the Liquidating Trust, in the event that all senior classes of Allowed Claims have been paid in full. In such event such Pro Rata Distributions shall be paid

as soon as reasonably practicable after receipt from the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds. Class 5 Interests are impaired.

**The timing and amount of Distributions to be made under the Plan and the Liquidating Trust cannot be known at this time, as such Distributions are contingent upon the recoveries under the Affirmative Claims.**

V

**IMPLEMENTATION OF THE PLAN**

Distributions to Allowed Claimants under the Plan will be funded from the Available Funds, which predominantly include and consist of the recoveries from the Affirmative Claims. The Liquidating Trustee selected by the Debtor is Kenneth A. Durr ("Durr"), the President of the Debtor. The Liquidating Trustee will implement the Plan through the Liquidating Trust.[11] The Debtor will continue with (a) its limited and wind down operations[12]; and (b) prosecution of the Affirmative Claims, as well as any other claims[13] if beneficial to the Debtor's estate. As reflected in the Second Stipulation and Order Amending and Modifying Cash Collateral Stipulation and Final Order, the Debtor presently has funds in the aggregate sum of $2.1 million

---

[11] As set forth in the Plan and the Liquidating Trust, Durr and the Debtor's employees shall (a) provide services relating to the Liquidating Trust and the limited operations in connection therewith and support for the prosecution of the Affirmative Claims, and (b) receive compensation therefor, in accordance with one or more cash collateral Budgets approved by Bankruptcy Court Order and/or as agreed in writing by the Secured Parties.

[12] As stated hereinabove, on or after January 2020, Debtor anticipates seeking and achieving additional budgetary cost savings over time, as warranted, based upon the circumstances of the case.

[13] The Debtor is examining and may pursue its affirmative claim against SofRock International, Inc. in an amount that exceeds $1.379 million.

to continue its operations and claim litigation support into the significant future[14]. It is the recoveries on the Affirmative Claims that form the crux of the Debtor's Plan in order to make and maximize distributions to the Debtor's creditors.

## VI

## **FEASIBILITY**

The Plan formulated by the Debtor presents the best method for the highest level of recovery on Claims. The continued prosecution of the Affirmative Claims, until disposition, whether by adjudication or settlement, as spearheaded by Durr, will provide the highest return to creditors. Proper claim support by the limited, but vital, Debtor's staff, as managed and coordinated by Durr, will promote the most effective prosecution of the Affirmative Claims, and therefore the ultimate monetary recoveries thereon.

It is important for creditors and interested parties to note that the respective special counsel representing the Debtor with respect to the PSEG Litigation and DEP claims are employed under contingency fee agreements, and as such, counsel are incentivized to achieve maximum recoveries under the circumstances and particular facts of each case. Further, such contingency employment terms (as opposed to hourly attorney compensation retention agreements) also demonstrate the strength of the merits of such litigation claims. Significantly,

---

[14] Other assets of the Debtor are nominal. As indicated herein, potential accounts receivable over and above the Affirmative Claims approximate $260,000; 13 vehicles (owned outright and/or financed to own net of liens) approximates $74,000; furniture and fixtures approximate $20,000; and equipment has liquidation value of approximately $50,000.

Moreover, with respect to potential preference claims of the Debtor's estate, no viable claims exist which would result in a return to creditors due to the defenses of the creditors, most especially, the fact that certain limited payments made by the Debtor within the 90 day period prior to the Filing Date were paid to subcontractors, suppliers and/or materialmen, and therefore were paid from construction trust funds, which were not property of the estate. Therefore, the payments made fail the prima facie elements of section 547 of the Bankruptcy Code.

the substantial recovery achieved in connection with the Enexio Arbitration claim likewise validates the Debtor's remaining Affirmative Claims and the strength thereof.

By virtue of this Plan being a liquidating Plan, which comports with the requirements for distributions to be made in accordance with the absolute priority rule of the Bankruptcy Code, distributions to creditors will be made by the Liquidating Trustee based upon Available Funds, in accordance with the Liquidating Trust.

## VII

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

In order for the Plan to be confirmed the following conditions must be fully satisfied or waived:

(a) the Confirmation Order must be entered by the Bankruptcy Court and be a Final Order, which such Order approves the Plan and the Liquidating Trust.

## VIII

## VOTING

Under the Plan, creditors in Classes 2, 3, 4 and 5 are impaired and entitled to vote. To be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the deadline set by the Bankruptcy Court, at Debtor's counsel's office, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attn: Adam P. Wofse, Esq.

# IX

## REQUIREMENT FOR CONFIRMATION OF THE PLAN

**A.    Confirmation Hearing**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan.  The confirmation hearing (the "Confirmation Hearing") shall be scheduled by the Bankruptcy Court to be held before the Honorable Stuart M. Bernstein, in Courtroom 723, in the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.    The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

**B.    Objections to Confirmation**

The Bankruptcy Court will direct that objections, if any, to Confirmation of the Plan be in writing, filed with the Bankruptcy Court with a courtesy copy to chambers of the Honorable Stuart M. Bernstein, with proof of service, and that such objections be served on or before such date as set forth in an additional notice or Order of the Bankruptcy Court.  Objections must be served upon (i) counsel to the Debtor, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York, 11793, Attention:  Adam P. Wofse, Esq.; and (ii) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attention: Andrew D. Velez-Rivera, Esq.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**C.    Acceptance of the Plan**

Acceptance of the Plan requires that each impaired Class of Claims accepts the Plan, with certain exceptions discussed below.  Thus, acceptance of the Plan is tested on a class by class

basis. Classes of Claims that are not impaired under the Plan are deemed to have accepted the Plan. Under the Plan, Classes 2, 3, 4 and 5 are impaired and as a result, Classes, 2, 3, 4 and 5 are entitled to vote.

**D.**     **<u>Confirmation of Plan</u>**

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including: (i) that the Plan has classified Claims in a permissible manner; (ii) that the contents of the Plan comply with the technical requirements of the Bankruptcy Code; (iii) that the Plan has been proposed in good faith; and (iv) that disclosures concerning the Plan have been made which are adequate and include information concerning all payments made or promised in connection with the Plan and the Chapter 11 case. The Debtor believes that all of these conditions have been or will be met.

**E.**     **<u>Cramdown</u>**

Section 1129 establishes the requirements for confirmation of a Chapter 11 plan. The requirements are numerous and differ depending on whether or not confirmation is consensual. If consensual confirmation is sought because all impaired classes accepted the plan, Section 1129(a) governs.

For non-consensual confirmation or "cramdown" under Section 1129(b), the Debtor must meet all of the requirements contained in Section 1129(a), except paragraph (8) of Section 1129(a). In addition, the Debtor must show that the plan does not unfairly discriminate against dissenting classes, and that the treatment of the dissenting classes is fair and equitable. In other words, the Bankruptcy Court may confirm over the dissent of a class of unsecured claims only if the members of the class are unimpaired, if they will receive under the plan property of a value equal to the allowed amount of their unsecured claims, or if no class junior will share under the

plan. That is, if the class is impaired, then they must be paid in full or, if paid less than in full, then no class junior may receive anything under the plan.

Although the Debtor seeks confirmation from its impaired classes by voting to accept the Plan, in the event an impaired class votes to reject the Plan, the Debtor will seek to confirm the Plan by utilizing the cram-down provision contained in §1129(b) of the Bankruptcy Code.

## X

## EFFECT OF CONFIRMATION; DISCHARGE OF DEBTS; INJUNCTION; RELEASE

### A. Effect of Confirmation

On the Confirmation Date, the terms of this Plan bind all holders of all Claims against the Debtor, whether or not such holders accept this Plan.

### B. Discharge of Debts

The rights afforded herein and the treatment of all Claims herein shall be in exchange for a complete satisfaction, discharge and release of Claims of any of any nature whatsoever, against the Debtor, the Debtor's estate or any of its assets or properties. Except as otherwise provided herein, on the Effective Date, all such Claims against the Debtor shall be satisfied, discharged and released in full, and all persons or entities are precluded and enjoined from asserting against the Debtor, the Reorganized Debtor, the Liquidating Trust and/or the Liquidating Trustee, their successors, or their assets or property, any other or further Claims based upon any act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date.

### C. Injunction

Effective on the Confirmation Date, all Persons who have held, hold, or may hold Claims against the Debtor or its assets are enjoined from taking any of the following actions against or affecting the Debtor or the assets of the Debtor with respect to such Claims (other than actions

brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtor or the assets of the Debtor or any direct or indirect successor in interest to the Debtor, including without limitation the Liquidating Trust and the Liquidating Trustee, or any assets of any such transferee or successor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtor or its assets or any direct or indirect successor in interest to the Debtor, or any assets of such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or the assets of the Debtor or its assets or any direct or indirect successor in interest to the Debtor, or any assets of any such transferee or successor other than as contemplated by the Plan; (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtor or its assets or any direct or indirect transferee of any assets of, or successor in interest to, the Debtor; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

**D.**   **<u>Release</u>**

As of the Effective Date, to the extent authorized by section 1141 of the Bankruptcy Code, the Debtor is released from all Claims, demands, actions, claims for relief, causes of actions, suits, debts, covenants, agreements and demands of any nature whatsoever, in law and in equity, that any creditor had, or now has, or may hereafter have against each of the Debtor arising prior to the Effective Date.

Except as otherwise provided herein and in section 1141 of the Bankruptcy Code, all Persons shall be precluded and enjoined from asserting against the Debtor, its assets or properties, or against any property that is distributed, or is to be distributed under the Plan, any other or further Claim upon any acts or omissions, transactions or other activity of any kind or nature that occurred prior to the Effective Date.

**E.**     **Exculpation**

The Exculpated Parties[15] and their property and professionals who provided services to the Estate during this Chapter 11 Case, and all direct or indirect predecessors-in-interest to any of the foregoing Persons, will not have or incur any liability to any Person for any act taken or omission occurring on or after the Filing Date in connection with or related to the Estate, including but not limited to the (i) the commencement and administration of the Chapter 11 Case, (ii) the operation of the Debtor during the pendency of the Chapter 11 Case, (iii) formulation, preparation, dissemination, implementation, confirmation, consummation or administration of (a.) the Plan (including soliciting acceptances or rejections thereof); (b.)  the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken during the administration of the Chapter 11 Case or in connection with the Plan; or (c.) any Distributions made pursuant to the Plan and the Liquidating Trust.  Exculpated Parties shall include the Liquidating Trustee, the Liquidating Trustee Professionals and employees of the Debtor which perform duties on behalf of the Liquidating Trustee (each in his/their capacity and role as Liquidating Trustee and/or on behalf

---

[15] "Exculpated Parties" means the Debtor and any current or former agent, representative, attorney, accountant, financial advisor, other professional or employee, officer or director of the Debtor, but only if and to the extent, in each case, such party served in such capacity on or after the Filing Date, and only in such capacity.

of the Liquidating Trustee and the Liquidating Trust), including without limitation, in connection with services rendered regarding any assets, claims and/or cause of action, including without limitation the Affirmative Claims, relating to the Trust and the recovery and distribution of the Available Funds. Nothing in this section shall (i) be construed as a release of such person's fraud, gross negligence, malpractice or willful misconduct with respect to the matters set forth in this section, or (ii) limit the liability of the Debtor's professionals to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

## XI

## ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS

A.     **Alternatives to the Plan**

The Debtor believes that the Plan provides creditors with the earliest and greatest possible value that can be realized on their respective Claims. The principal alternatives to confirmation of the Plan are: (i) dismissal of the case, or (ii) conversion of the case to one under Chapter 7 of the Bankruptcy Code.

(i)     Dismissal

A dismissal of this case would lead to the immediate cessation of (a) all work on the Debtor's remaining ongoing project, and (b) the orderly wind down of the Debtor's operations. The Debtor's employees, who are diligently working alongside special counsel for the labor and fact intensive prosecution of the PSEG Litigation and the DEP claims, would likely terminate their employment immediately. A multitude of chaotic and expensive adverse creditor actions, including lawsuits, would ensue. In the event the Debtor's business ceased, the Debtor would likewise have difficulty continuing to judiciously prosecute the Affirmative Claims, which would therefore likely result in unfavorable dispositions of the Affirmative Claims. Essentially, a

dismissal of the case will result in the Debtor achieving drastically reduced recoveries concerning the Affirmative Claims. As such, only a portion of the secured debt in this case would receive a distribution, in the order of priority under the Bankruptcy Code and applicable law, and thus, one or more secured creditors would be undersecured, with all junior claims in the case receiving no distribution whatsoever.

(ii)     <u>Conversion to Chapter 7</u>

The Debtor submits that a conversion to Chapter 7 would not be in the best interests of creditors.  As described in Section XI (B) below ("Best Interests of Unsecured Creditors"), liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code would not generate a greater distribution to creditors than proposed under the Plan.  Under Chapter 7 of the Bankruptcy Code, the appointment of a trustee without the historical experience or knowledge of the Debtor's business and critical claim support as contributed by the Debtor's employees, especially relating to the Affirmative Claims, would likely result in a greatly diminished recovery to creditors.  Specifically, a Chapter 7 Trustee would likely settle the remaining Affirmative Claims at substantially reduced rates, because of the time, effort and resources of the estate which would have to be utilized and expended over a protracted period to reach a disposition of the Affirmative Claims.  Further, the secured creditors would be compelled to grant the Trustee and his professionals a carve out from their liens in order for the Trustee to prosecute the Affirmative Claims.  Moreover, a conversion of the case to Chapter 7 is not sensible in that the Debtor is already liquidating in an effective and orderly manner, and has been winding down over an extended period of time.  Further, the additional level of administrative costs incurred by a Chapter 7 Trustee and its attorneys and accountants would be substantial, and would therefore further eradicate the ability of creditors to receive payments on their claims.

Similar to the dismissal analysis above, the only creditors that might benefit from conversion would be one or more secured creditors—likely Zurich on its priming lien and the Secured Banks on only a portion of their secured claims (thus undersecured), but not reaching more junior secured (thus essentially unsecured) or general unsecured creditors. Whereas, under the Plan, more classes of creditors receive a distribution and in higher amounts than would be possible in Chapter 7.

Therefore, the Debtor believes that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the funds available for distribution to creditors.

**B.**     <u>**Best Interests of Unsecured Creditors**</u>

Notwithstanding acceptance of the Plan by Classes of Claims, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes of Claims. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired Class of Claims a recovery which has a present value at least equal to the present value of the distribution which each such creditor would receive from the Debtor if its assets were instead distributed by a Trustee under Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "Best Interests Test" with respect to all Classes of Claims since, the creditors, in order of priority, will receive payments under the Plan whereby more classes of creditors would receive recoveries, and of those receiving recoveries, the most junior creditors would receive higher recoveries than they otherwise would under a Chapter 7 liquidation.

The cost of converting the case to one under Chapter 7 would include the fees of a trustee, as well as those of the Chapter 7 Trustee's counsel and other professionals that may be

retained by the Chapter 7 Trustee, and unpaid expenses incurred by the Debtor during the Chapter 11 case (such as fees for attorneys and accountants). Assuming a carve out was even obtained by a Chapter 7 Trustee, these claims, and such other claims as might arise in the liquidation or result from the Debtor's Chapter 11 case, would be paid from the Debtor's assets before its assets would be available to pay all classes of claims, which each higher class would have to be paid in full before even reaching unsecured claims. As stated above, a Chapter 7 Trustee without the historical or technical knowledge and resources that are critical to the prosecution of the Affirmative Claims typically would settle such claims at drastically reduced levels.

Whereas, it is by virtue of the prudent and proper support and prosecution of the Affirmative Claims that will result in the highest level of recoveries for the benefit of all creditors.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST POSSIBLE RECOVERY ON ACCOUNT OF CLAIMS AND THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS

**C.** **Liquidation Analysis**

The Debtor believes that if the case was converted to Chapter 7, unsecured creditors would receive no distribution at all, as a liquidation of the de minimis hard assets of the Debtor and likely vastly reduced settlements achieved in connection with the Affirmative Claims would result in only some secured creditors being paid in full, with the next junior secured creditor receiving only a distribution on a portion of its claim. At such a reduced level of recovery, all junior creditors would receive no distribution whatsoever. Confirmation of the Debtor's Plan will provide the greatest return to more creditors and also avoid the additional layer of Chapter 7

Administrative Claims that must be paid if the case were converted to Chapter 7. Furthermore, the Secured Parties have been actively involved in this case and the Debtor frequently confers with such creditors in an attempt to preserve and maximize the Debtor's assets and distributions thereof for all concerned.

The Debtor believes that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the value of property available for distribution to most Classes of Claims. Accordingly, the Debtor submits that confirmation of the Plan, rather than the alternatives described above, is in the best interests of creditors.

## XII

## RECOMMENDATION OF THE DEBTOR

The Plan and this Disclosure Statement were drafted and submitted by the Debtor. As such, the Debtor strongly supports this Plan and believes that Confirmation of the Plan provides the Creditors with the best possible recovery in the shortest possible time.

## XIII

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Plan, and any other materials or questions relating to the Plan and this Disclosure Statement should be directed to Debtor's counsel, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attention:  Adam P. Wofse, Esq., at (516) 826-6500 during regular business hours.

# XIV

## TAX CONSEQUENCES

The Debtor is not aware of any tax consequences which may result from the confirmation of the Plan. Creditors should consult with their own tax advisor concerning any such tax related implications. Creditors should consult with their tax advisor concerning (a) any deductions which may be applicable to them as bad debt deductions, or (b) income tax implications based upon forgiveness of debt, if applicable, based upon the provisions of the Debtor's Plan.

Pursuant to IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based upon their particular circumstances from an independent tax advisor.

# XV

## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors.

Dated:  September 12, 2019

**LaMonica Herbst & Maniscalco, LLP**
Counsel to the Debtor

By:  */s/ Adam P. Wofse*
Adam P. Wofse, Esq.
Gary F. Herbst, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500

Dated:  September 12, 2019

**Debtor**

By:  */s/ Kenneth A. Durr*
Kenneth A. Durr, President