LaMonica Herbst & Maniscalco, LLP
*Attorneys for the Debtor*
3305 Jerusalem Avenue
Wantagh, New York 11793
516.826.6500
Adam P. Wofse, Esq.
Gary F. Herbst, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                                      Chapter 11

DURR MECHANICAL CONSTRUCTION, INC.                          Case No. 18-13968-LGB

                              Debtor.
-------------------------------------------------------------X

# CHAPTER 11 DEBTOR'S
# ~~SECOND~~ PROPOSED THIRD AMENDED DISCLOSURE STATEMENT

### LAMONICA HERBST & MANISCALCO, LLP
Attorneys for the Chapter 11 Debtor

By:  Adam P. Wofse, Esq.
Gary F. Herbst, Esq.

3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION (THE "PLAN") PROPOSED BY THE DEBTOR.  NO OTHER REPRESENTATIONS CONCERNING THE DEBTOR, THE VALUE OF ITS ASSETS OR BENEFITS OFFERED UNDER THE PLAN HAVE BEEN AUTHORIZED.

THE APPROVAL OF THE DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS OF THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN. [BANKRUPTCY COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION ON THE MERITS OF THE PLAN.]  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT "1" AND DESCRIBED HEREIN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE WHICH ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION WHETHER TO APPROVE THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION; NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR AND FROM OTHER SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

**TABLE OF CONTENTS**

Page

I INTRODUCTION ..................................................................................................... 1
   A.   Background .................................................................................................... 1
   B.   The Plan Confirmation Process ................................................................... 2

II SUMMARY OF PLAN ............................................................................................ 3
   Source of Information .......................................................................................... 3

III HISTORY OF THE CHAPTER 11 CASE ............................................................... 3
   A.   The Debtor's Business Operations ............................................................... 3
   E.   Retention of Professionals .......................................................................... 14
   F.   Claims Bar Date .......................................................................................... 15

IV THE PLAN OF LIQUIDATION ............................................................................. 16
   A.   Explanation of Chapter 11 .......................................................................... 16
   B.   Claims ......................................................................................................... 17
   C.   Classes Of Claims or Interests ................................................................... 17
   D.   Treatment of Allowed Claims .................................................................... 22

V IMPLEMENTATION OF THE PLAN ...................................................................... 28

VI FEASIBILITY ........................................................................................................ 30

VII CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
     EFFECTIVE DATE .......................................................................................... 30

VIII VOTING ............................................................................................................... 31

IX REQUIREMENT FOR CONFIRMATION OF THE PLAN .................................... 31
   A.   Confirmation Hearing ................................................................................. 31
   B.   Objections to Confirmation ......................................................................... 31
   C.   Consensual Acceptance of the Plan ............................................................ 32
   D.   Confirmation of Plan ................................................................................... 32
   E.   Cramdown ................................................................................................... 33

X EFFECT OF CONFIRMATION; INJUNCTION ...................................................... 33
   A.   Effect of Confirmation ............................................................................... 33

XI ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS ................. 35
   A.   Alternatives to the Plan .............................................................................. 35
   B.   Best Interests of Unsecured Creditors ........................................................ 37
   C.   Liquidation Analysis ................................................................................... 38

XII RECOMMENDATION OF THE DEBTOR ............................................................ 39

i

XIII  ADDITIONAL INFORMATION.................................................................................. 39

XIV  TAX CONSEQUENCES........................................................................................... 39

XV  CONCLUSION......................................................................................................... 40

# I

## INTRODUCTION

**A.** **Background**

Durr Mechanical Construction, Inc., the debtor (the "Debtor"), submits this proposed ~~Second~~Third Amended Disclosure Statement (the "Disclosure Statement") pursuant to § 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), to the creditors of the Debtor (the "Creditors") in connection with the: (i) the Debtor's ~~Second~~Third Amended Plan of Liquidation dated ~~March 11,~~April ___, 2021 (the "Plan"), proposed and filed by the Debtor with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and (ii) hearing on confirmation of the Plan to be scheduled by further notice and/or Order of the Bankruptcy Court. **Unless otherwise defined herein, all capitalized terms contained herein will have the meanings ascribed to them in the Plan.**

Attached as Exhibits to and accompanying this Disclosure Statement are copies of the following:

Exhibit 1 – The Plan
Exhibit 2 – Court approved disbursements relating to Enexio Arbitration Award proceeds
Exhibit 3 – Budget/Projections
Exhibit 4 – Professional Fees
Exhibit 5 – Liquidation Analysis
Exhibit 6 – Liquidating Trust Agreement

BALLOTS ARE BEING PROVIDED TO HOLDERS OF ALLOWED PRIORITY TAX CLAIMS AND CLAIMS IN CLASSES 2, 3 and 4 BECAUSE CLASSES OF IMPAIRED CLAIMS ARE PERMITTED TO VOTE ON THE PLAN, WHEREAS CLASSES THAT ARE UNIMPAIRED ARE NOT ENTITLED TO VOTE AND ARE PRESUMED TO HAVE ACCEPTED THE PLAN. CLASS 5 (INTERESTS OF THE DEBTOR) IS DEEMED TO HAVE REJECTED THE PLAN.

**B.**     <u>**The Plan Confirmation Process**</u>

The Bankruptcy Court approved this Disclosure Statement as containing adequate information to permit creditors of the Debtor to make a reasonably informed decision in exercising their right to vote upon the Plan.  Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.  Each Creditor should read this Disclosure Statement and the Plan in their entirety.

Pursuant to various provisions of the Bankruptcy Code, only classes of claims that are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject such plan.  Accordingly, pursuant to the Debtor's Plan, Priority Tax Claims and Classes of Claims 2, 3 and 4 are entitled to vote.  Class 5 (interests of the Debtor) is deemed to have rejected the Plan.

In accordance with § 1128 of the Bankruptcy Code, the Bankruptcy Court shall schedule pursuant to separate notice or Order a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), in the Courtroom of the Honorable Lisa G. Beckerman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom 601, One Bowling Green, New York, New York 10004-14081.  Objections, if any, to confirmation of the Plan shall be served and electronically filed with the Bankruptcy Court in accordance with such further notice from and/or Order of the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned hearing date made at the Confirmation Hearing or at any subsequent adjourned date.

## II

## SUMMARY OF PLAN

The classification and treatment of Claims under the Plan are set forth in Article IV below. The Plan is a liquidating plan. The Plan provides for payments on Allowed Claims in accordance with the priorities for claims as set forth under the Bankruptcy Code.

**Source of Information**

The information contained in this Disclosure Statement was prepared by the management of the Debtor, based upon the Debtor's books and records, the Debtor's bankruptcy petition and schedules, and preliminary review of all proofs of claim timely filed with the Bankruptcy Court. The estimates of Claims set forth herein may vary from the final amount of Claims allowed by the Bankruptcy Court, however, the Debtor believes that the numbers and dollar amounts reflected herein are reasonably accurate according to currently filed claims and scheduled debts of creditors that have not filed a proof of claim. While every effort has been made to ensure the accuracy of all such information, the information presented herein is unaudited and has not been examined, reviewed, or compiled by an independent public accountant.

## III

## HISTORY OF THE CHAPTER 11 CASE

A.    **The Debtor's Business Operations**

The Debtor is a New York corporation founded in 1985 as a small family-owned mechanical construction business by Robert Durr, Sr. Since Robert Durr, Sr.'s retirement in 2012, the Debtor has been run by Kenneth A. Durr and Robert Durr, Jr. The Debtor's ownership structure consists of 1000 shares of stock, broken down as follows: (a) 900 shares of non-voting stock which is distributed among: (i) Robert Durr, Jr. who owns 423 shares; (ii) Kenneth A. Durr who owns

3

423 shares and (iii) Frank Heidinger who owns 54 shares; and (b) 100 shares of voting stock which is distributed among: (i) Robert Durr, Jr. who owns 45 shares; (ii) Kenneth A. Durr who owns 45 shares and (iii) Robert Durr, Sr. who owns 10 shares.

The Debtor was a leader and innovator in the mechanical construction industry. Its work involved installation, rigging, setting, assembly, alignment and grouting of assorted process and power equipment including electric or steam driven compressors, ACC's, HRSG's, turbines, pumps, heat exchangers, boilers, tanks, heaters and packaged HVAC systems. The Debtor's work scope also included the installation and testing of instruments, controls and apparatus associated with power and process systems.  It distinguished itself with an in-house quality assurance program and capabilities that have been demonstrated and approved by both the American Society of Mechanical Engineers (ASME) and the National Board of Boiler and Pressure Vessel Inspectors. The Debtor had been issued "U", "R", "NB" and "S" stamps indicating the Debtor's authorization to perform repair, manufacture and assemble boiler and pressure vessels.

Throughout 2018, the Debtor worked on over fifty small to large size projects which resulted in revenues in excess of twenty million dollars. During 2016, The Debtor's total sales exceeded $54,600,000 and during 2017, the Debtor's gross sales exceeded $197,860,000.  In its thirty-two (32) year history in the mechanical construction business, the Debtor generated gross sales which exceeded $1,392,000,000, which has resulted in gross profits of over $130,787,000.

**B.**     **<u>Events Leading to the Chapter 11 Filing</u>**

The Debtor can trace the source of its pre-petition financial difficulties to the following circumstances, which stemmed from three (3) particular projects.

The Debtor, being a leader in the mechanical industry, serviced many large-scale projects. The Debtor experienced severe cash flow issues primarily as a result of the refusals of the two

4

owners and one equipment manufacturer of three projects to timely pay amounts due and owing to the Debtor in connection with those projects.  Specifically, the equipment manufacturer and owners who failed to pay pre-petition are (a) Enexio US LLC ("Enexio"), (b) PSEG Fossil, LLC ("PSEG"), and (c) the New York City Department of Environmental Protection ("NYC-DEP") (collectively, Enexio, PSEG and NYC-DEP, the "Obligors"). As of the Filing Date, the aggregate sum due to the Debtor from these projects (and affirmative claims for damages as further set forth below) exceeded $122 million. As of the Filing Date, the Enexio and PSEG projects were completed and the NYC-DEP project was substantially complete with primarily punch list work remaining.

Pre-petition, the Debtor's cash flow problems negatively affected its operations because certain subcontractors, vendors and/or creditors (a) filed liens against projects, (b) filed claims against payment bonds, and/or (c) commenced litigation against the Debtor for nonpayment, all of which further exacerbated the Debtor's distressed financial situation.  In November 2018, the Debtor, without sufficient cash flow (and without surety authorization to complete bonded projects or the ability to secure bonds for additional projects), began to wind down all projects, which included the completion, termination and/or transfer of some projects, and the Debtor stopped soliciting new work.

On December 7, 2018 (the "Filing Date"), the Debtor was ultimately compelled to file its Chapter 11 petition in order to (a) afford itself of the protections under the Bankruptcy Code and grant the Debtor a breathing spell from a multitude of adverse creditor actions, and (b) protect the extremely valuable affirmative litigation claims (the Original Affirmative Claims, as defined below), which the Debtor held against the multiple Obligors, as set forth more fully below.

5

C.    <u>**Operations as a Debtor in Possession**</u>

Since the Chapter 11 filing, the Debtor stabilized its business, continued its wind down efforts, closed out and finished jobs, discontinued and transferred other jobs, and continued the prosecution of the extremely valuable Original Affirmative Claims.  Early in the Chapter 11 case, the Debtor and Zurich[1] negotiated and entered a DIP loan agreement, which was approved by the Bankruptcy Court, in the amount of $750,000.00[2], in order to provide critical funds necessary for the Debtor's continued operations and prosecution of the valuable Original Affirmative Claims.

The Debtor's assets, separate and apart from the Affirmative Claims, are nominal.  The Debtor recently sold all of its remaining vehicles, furniture, and equipment[3].  The Debtor presently has a total of approximately $260,000 (reasonably collectable) in accounts receivable due from various project owners and general contractors.[4]

Presently, the Debtor has six part-time employees concentrating in litigation support.

The Debtor recently operated its business from its one remaining rented location in Tannersville, Pennsylvania.[5]  In December 2020, the Debtor vacated the premises, and all business

---

[1] As defined in the Plan, "Zurich" means Zurich American Insurance Company and its subsidiaries and affiliates, including but not limited to, Fidelity and Deposit Company of Maryland.

[2] Pursuant to the Second Stipulation and Order Amending and Modifying Cash Collateral Stipulation and Final Order, Zurich has been repaid the sum of $554,269.27 (representing $500,000 of principal, plus interest and legal fees).

[3] The Debtor still possesses its computers (of insignificant market value) needed for litigation support.

[4] Setoff and/or defenses may be asserted against such claims; these receivables are in addition to the remaining Affirmative Claims in excess of $95.5 million set forth and discussed more fully herein.

[5] Prior to and for a short period following the Filing Date, the Debtor operated from three locations:  80 8th Avenue, New York, New York was the Debtor's principal office, with shop and storage facilities in Westbury, New York, and Tannersville, Pennsylvania.

6

and litigation documents are now stored at a storage facility (and certain litigation documents are also electronically stored).

It was by virtue of this Chapter 11 proceeding and the Debtor's implemented strategy that the considerably valuable (a) Enexio arbitration award (one of the Original Affirmative Claims), in excess of $10.9 million, was able to be realized, and (b) remaining Affirmative Claims could continue to be pursued, for the maximum benefit to the Debtor's estate and creditors, as explained more fully below.

D.      **The Debtor's Original Affirmative Claims and Pending Affirmative Claims**

As stated above, as of the Filing Date, the Debtor possessed multiple, extremely valuable affirmative claims (the "Original Affirmative Claims") against the aforementioned Obligors.  As indicated above, the aggregate total of the Original Affirmative Claims exceeded $122 million.

(1)     **Enexio**

On or about November 14, 2017, the Debtor filed a demand for arbitration against Enexio with the American Arbitration Association, Case No. 01-17-0006-9347, seeking to recover sums totaling $15,230,333.85 arising out of a project for construction of the air cooled condensers at the CPV Towantic Energy Center, a 785 megawatt natural gas-fueled combined-cycle electric generating facility in Oxford, Connecticut (the "Arbitration").  Schiff Hardin LLP and Shipman & Goodwin LLP represented the Debtor in this action and related proceedings.

The Arbitration case against Enexio concluded, and an award (the "Arbitration Award") in favor of the Debtor was issued by the arbitration panel on April 24, 2019, in the total amount of $9,590,433.15, plus certain applicable interest and costs.  The Enexio Arbitration Award funds were received by the Debtor, on or about June 18, 2019, in the total sum of $10,902,434.21.  As set forth in prior pleadings and proceedings held in this case, the receipt of the Arbitration Award

7

would provide, and has provided, the Debtor with indispensable additional financial support, and allowed for payment of certain secured claims and other debts (including contingency fees to special counsel and other interim fees to Debtor's professionals). Thereafter, the approximate sum of $2.1 million remained available and was utilized for the Debtor's continued operations and judicious prosecution of the remaining Affirmative Claims, which presently seek recoveries for damages exceeding the approximate aggregate sum of $95.5 million[6]. See Exhibit 2[7], which reflects the Arbitration Award and the Court approved expenditure of funds and reserve available, at the time, which was utilized for the Debtor's continued operations to date.

(2) **PSEG**

In relation to one of the Debtor's prepetition large-scale projects, prior to the Filing Date, on or about June 15, 2018 the Debtor filed a complaint against PSEG, captioned Durr Mechanical Construction, Inc. v. PSEG Fossil, LLC, Civil action number 18-CV-10675 (KM) (CW), in the United States District Court for the District of New Jersey, seeking to recover the aggregate amount of approximately $93,218,512.35 (the "PSEG Litigation"). Peckar & Abramson, P.C. represents the Debtor in this action concerning this Affirmative Claim.

Originally, the Debtor's claims asserted in the PSEG Litigation relate to Debtor's work, as a mechanical piping contractor, for the construction of the new Sewaren 7 Combined Cycle Power Plant in Woodbridge, New Jersey, built for the Defendant, PSEG Fossil, LLC (PSEG). Note that

---

[6] The aggregate damages sought by the Debtor regarding the Affirmative Claims originally exceeded $122 million; however, as a result of the court's decision regarding the PSEG motion to dismiss, the aggregate damages sought in connection with the Affirmative Claims now exceed $95.5 million. See discussion regarding PSEG Affirmative Claim litigation in subparagraph (2) herein.

[7] The Debtor was authorized to use cash collateral pursuant to and in accordance with the Second Stipulation and Order Amending and Modifying Cash Collateral Stipulation and Final Order Pursuant to 11 U.S.C. §§ 361 and 363 dated August 27, 2019 [Docket No. 296].

8

some of the pre-assembly construction work for the Sewaren 7 plant (especially for the Heat Recovery Steam Generator (HRSG) and the Air Cooled Condenser (ACC)) took place off site at Coeymans in upstate New York.  In connection with the PSEG Litigation, the Debtor asserted against PSEG claims for breach of contract, quantum meruit, misrepresentation, breach of the covenant of good faith and fair dealing, bad faith, interference with contract, and interference with prospective business advantage totaling over $93 million.

Shortly after the commencement of the suit, the action was suspended while the parties engaged in mediation proceedings.  Mediation was unsuccessful and concluded in December 2019. Following mediation, the litigation resumed, with PSEG moving to dismiss certain causes of action, to which the Debtor filed opposition.  On January 29, 2021, the Court issued a decision favorable to the Debtor by dismissing only two causes of action, while keeping the remaining causes of action in the litigation.  The effect of the motion to dismiss reduced the Debtor's damages claim from $93 million to $68 million, plus interest.  The Court also issued an order directing the parties to produce discovery documents on a rolling basis.

By virtue of the Bankruptcy Court's bar date Order dated and entered February 25, 2019 (the "Bar Date Order")[Docket No. 162], which established April 15, 2019 (the "Bar Date"), as the date by which any asserted creditor of the Debtor's estate was required to file its proof of claim with the Bankruptcy Court, the failure to so file such a claim barred any such asserted creditor from voting on the Chapter 11 Plan and receiving any distribution in this bankruptcy case.

Accordingly, PSEG, by having failed to file a proof of claim in this case, is no longer entitled to receive a distribution from the Debtor or, the Debtor's estate, or the Liquidating Trust, on account of any counterclaim, which may have existed as of the Filing Date. However, pursuant

9

to applicable law and/or the Lift Stay Order[8], PSEG may be entitled to assert affirmative defenses, including setoff.[9] The Debtor asserts that, to the extent PSEG does and/or can assert a setoff defense, such defense is unsupported and without merit.

The Debtor anticipates affirmatively recovering on this Affirmative Claim against PSEG via the continued litigation. The Debtor anticipates a likely affirmative recovery on this Affirmative Claim against PSEG through either settlement prior to trial or through a trial before the U.S. District Court of the District of New Jersey. The trial, if necessary, should occur within the next 1½ to 2 years depending upon, among other things, the following: (a) the court's calendar and its current backlog of cases due to the pandemic; (b) discovery continuing on its current course; (c) additional required motion practice; (d) the cooperation of all relevant witnesses, and (e) the availability of relevant documents. Damages sought by the Debtor from PSEG, for the benefit of the Debtor's estate and creditors, exceed $68 million, plus interest (which continues to accrue).

**(3)  NYC-DEP**

In relation to another one of the Debtor's prepetition large-scale projects, prior to the Filing Date, the Debtor has pursued a recovery on certain affirmative claims against the City of New York (the "City"), acting by and through the New York City Department of Environmental Protection ("DEP"), arising out of Contract CRO-312 for the project known as the Croton Water Treatment Plant located at Van Cortlandt Park, Bronx, New York (the "DEP Project"). Cullen and Dykman LLP represents the Debtor in connection with this Affirmative Claim. Since the

---

[8] Order Granting Motion to Modify the Automatic Stay dated January 3, 2019 [Docket No. 73].

[9] By this Disclosure Statement, the Debtor is not seeking a determination by this Court as to whether PSEG has the right to assert setoff.

10

Filing Date, the Debtor has engaged in extensive discovery with DEP regarding the City's alleged defenses to the Debtor's claims, and recently, on September 3, 2020, filed an adversary proceeding against the City to recover on this Affirmative Claim.  Subsequently, the City filed a motion to dismiss certain causes of action of the complaint and/or seeking to have certain causes of action resolved in a forum other than the Bankruptcy Court, and the Debtor filed opposition to the motion. The preliminary hearing on the motion was held on December 23, 2020, with further briefing ordered by the Court on limited issues raised on the record of the hearing and a subsequent hearing to be held on March 17, 2021 regarding the arbitrability of certain claims and a subsequent hearing was held on March 17, 2021.  While a decision on the City's motion to compel arbitration of certain of the claims asserted in the complaint relating to substantial completion of the DEP Project is pending before the Court, the parties continue to engage in an informal exchange of information pertaining to the Affirmative Claim.  The Debtor anticipates that any potential settlement of the Affirmative Claim may be attainable within the next 6-9 months, whereas a trial in any forum would require at least a year prior to resolution, subject to the court calendar.

Specifically, the Debtor asserts claims against DEP relating to the Debtor's work, as the "H" prime contractor, to procure, install, and startup a complete HVAC system for the water treatment facility owned and operated by the DEP.

As a consequence of impacts to the Debtor's work on the DEP Project due to uncontemplated events beyond its control, the Debtor incurred a damages claim against DEP on account of delays and disruption to the DEP Project, in the amount of not less than approximately $25 million, inclusive of statutory interest which continues to accrue, and also sought to recover

11

approximately $2.5 million in unpaid contract balances due and owing to the Debtor from DEP.[10] This claim continues to accrue due to DEP's improper refusal to issue a certificate of "substantial completion" of the Debtor's work under the contract where the declaration of substantial completion was made to the state and federal government as of December 9, 2013, the plant has been in operation since May 2015, and was approved as complete by the New York State Department of Health, effective June 10, 2016.

    **(4)  IK**

On June 4, 2014, the Debtor entered into a general contract with Covanta Essex Company to provide construction management and other services relating to the Essex Baghouse Project (the "Baghouse Project"). In connection with the Baghouse Project, on August 13, 2014, the Debtor entered into a subcontract (the "IK Subcontract") with IK for IK to perform all steel fabrication and erection for the Baghouse Project. Due to IK's various breaches under the terms of the IK Subcontract, on February 18, 2016 the Debtor sent IK a three-day notice stating that if the various breaches under the IK Subcontract were not cured, the Debtor would take corrective action, including terminating the IK Subcontract. When IK failed to cure, on March 2, 2016, the Debtor sent a letter officially terminating the IK Subcontract. Subsequently, the Debtor took corrective action to complete the work required under the IK Subcontract, which resulted in actual costs to the Debtor of $1,305,614 (constituting damages owed by IK to the Debtor).

On May 1, 2016, and following the termination of the Subcontract, IK filed a bond claim

---

[10] Subsequent to the filing of the suit, NYC-DEP paid the Debtor approximately $1,500,000 on account of the unpaid contract balances.

12

against the payment bond[11] issued by Zurich[12] in connection with the Baghouse Project asserting unpaid amounts allegedly owed by the Debtor to IK for retainage of $489,729.00, change orders of $395,364.80, and an amount to be calculated for contract payments, which after an inquiry from Zurich, IK provided a breakdown of its claim which totaled $1,249,687.35. On February 20, 2017, IK filed an amended bond claim, which revised and increased IK's total claim against the bond (for monies allegedly owed by the Debtor to IK) to $1,924,128.00 ("Amended Bond Claim"). On March 7, 2019, IK filed a proof of claim in this case against the Debtor in the sum of $1,924,128.00 (the "IK Proof of Claim).

On July 2, 2019, the Debtor commenced an adversary proceeding against IK ("IK Adversary Proceeding") which, among other things, (a) sought money damages against IK on the Debtor's Affirmative Claim in excess of $1.3 million relating to the breach of the Subcontract and (b) objected to the IK Proof of Claim. In its answer to the complaint in the IK Adversary Proceeding, IK asserted a counterclaim against the Debtor in the amount of $1,924,128.00. The parties are presently engaged in discovery in the IK Adversary Proceeding. In June 2020, the Court directed that the parties engage in mediation, which concluded without resolution in July 2020. The case is expected to go to trial in the second quarter of 2021.

---

[11] In accordance with an indemnity agreement between the Debtor and Zurich, the Debtor is obligated to indemnify Zurich for all losses under the bond, and such indemnification claim held by Zurich against the Debtor is a secured claim by virtue of the applicable security agreement and UCC-1 filing.

[12] As defined in the Plan, Zurich includes its affiliate Fidelity.

13

Greenbaum Rowe Smith Davis LLP represents the Debtor (and Zurich)[13] in connection with the IK Adversary Proceeding.

———

In sum, regarding the Affirmative Claims outlined above, given the extraordinary failure and refusal of the Obligors (together with the cumulative effect thereof relating to other obligors) to pay their obligations to the Debtor, the Debtor was forced into a distressed financial situation and constrained to reorganize via an orderly liquidation, in order to protect, preserve and maximize the value of the Debtor's assets—essentially, the Affirmative Claims—for the benefit of the Debtor's estate and its creditors. It is the monetary recoveries to be achieved via the remaining Affirmative Claims, seeking damages in excess of $95.5 million (plus interest), which form the basis for the proposed Plan and the Liquidating Trust.

E.    **Retention of Professionals**

As of the Filing Date, the Debtor employed LaMonica Herbst & Maniscalco, LLP ("LHM") as general bankruptcy counsel to the Debtor. By Order dated January 7, 2019, the Bankruptcy Court authorized the Debtor's employment of LHM.

As of the Filing Date, the Debtor employed Grassi & Co. ("Grassi") as financial advisor to the Debtor. By Order dated January 8, 2019, the Bankruptcy Court authorized the Debtor's employment of Grassi.

---

[13] Pursuant to Stipulation and Order [Docket No. 342], the Court approved legal fees and expenses of Greenbaum to date have been and shall be paid by Zurich (which shall increase Zurich's secured claim), and upon any affirmative recovery in the litigation, Zurich shall be reimbursed for such professional fees and expenses paid.

14

As of the Filing Date, the Debtor employed Schiff Hardin LLP ("Schiff") in connection with the Enexio Arbitration.  By Order dated December 21, 2018, the Bankruptcy Court authorized the Debtor's employment of Schiff as special construction litigation counsel to the Debtor.

As of the Filing Date, the Debtor employed Peckar & Abramson, P.C. ("P&A") in connection with the PSEG Litigation.  By Order dated January 7, 2019, the Bankruptcy Court authorized the Debtor's employment of P&A as special construction litigation counsel to the Debtor.

As of the Filing Date, the Debtor employed Shipman & Goodwin LLP ("S&G") in connection with the Enexio Arbitration.  By Order dated January 8, 2019, the Bankruptcy Court authorized the Debtor's employment of S&G as special Connecticut construction litigation counsel to the Debtor.

As of the Filing Date, the Debtor employed Cullen and Dykman LLP ("C&D") in connection with the DEP claims.  By Order dated January 16, 2019, the Bankruptcy Court authorized the Debtor's employment of C&D as special construction litigation counsel to the Debtor.

By Order of the Court dated November 21, 2019, the Bankruptcy Court authorized the Debtor's employment of Greenbaum Rowe Smith Davis LLP as special litigation counsel to the Debtor, effective November 14, 2019, in connection with the IK Adversary Proceeding.

**F.    Claims Bar Date**

By the Bar Date Order, the Bankruptcy Court fixed April 15, 2019 as the Bar Date, which is the date by which creditors must have filed a proof of claim ("Proof of Claim") in this case. Accordingly, any Creditor having filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, and whose Claim is deemed an Allowed Claim, will receive payment, if any, in

15

accordance with the terms of the Plan and the Liquidating Trust. In accordance with the Bar Date

Order, any Creditor who failed to file a Proof of Claim on or before the Bar Date, i.e. April 15,

2019, which is not listed on the Debtor's Schedules or is listed as "disputed," "contingent" or

"unliquidated" on the Debtor's Schedules, will not be treated as a creditor for the purposes of

voting and receiving a distribution under the Plan (and/or Liquidating Trust) in this case.

IV

**THE PLAN OF LIQUIDATION**

**A.**     <u>**Explanation of Chapter 11**</u>

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter

11, a debtor seeks to reorganize its business and financial affairs. A debtor may also liquidate its

assets and wind up its affairs in Chapter 11. The formulation and confirmation of a plan of

reorganization or liquidation is the principal purpose of a Chapter 11 case. A plan of liquidation

sets forth the means of satisfying the holders of claims against a Chapter 11 debtor. Chapter 11

does not require that each holder of a claim against a debtor vote in favor of a plan in order for the

Bankruptcy Court to approve a plan. If any class of claimants is "impaired" by a plan, the plan

must be accepted by at least one "impaired" class of claims. A claim that will not be repaid in full,

or a Claimant whose legal rights are altered, or an interest that is adversely affected, are deemed

"impaired."

The holder of an impaired claim is entitled to vote to accept or reject the plan if the claim

has been allowed under § 502 of the Bankruptcy Code, or temporarily allowed for voting purposes

under Rule 3018 of the Federal Rules of Bankruptcy Procedure. Acceptance by a particular class

must be by a majority in number and two-thirds (2/3) of the dollar amount of the total claims

actually voting in the class.

16

**B.**    <u>**Claims**</u>

Pursuant to the Bar Date Order, any creditor who failed to file a proof of Claim on or before the Bar Date and was not listed on the Schedules, or was listed as "disputed," "contingent" or "unliquidated", cannot be treated as a creditor with respect to such Claim for purposes of voting on and receiving a Distribution under the Plan (or the Liquidating Trust) in this case.

All Proofs of Claim filed in this case have been preliminarily reviewed, and to the extent necessary, the Debtor and/or the Liquidating Trustee will further review such claims and file objections to certain filed claims. The Bankruptcy Court will retain jurisdiction to adjudicate objections to claims brought by the Debtor and/or the Liquidating Trustee, including any settlements or compromises of such claims. The Debtor reserves all of its and the Liquidating Trustee's rights to object to Claims.

The figures and information set forth below represent the Debtor's best estimate of the total amount of Allowed Claims in the case. These estimates have been developed by the Debtor based upon (i) an analysis of its books and records; and (ii) filed proofs of claim. By Order of the Bankruptcy Court, April 15, 2019 was set as the last date for filing Proofs of Claim with the Clerk of the Bankruptcy Court. There can be no assurance that the amount of Claims that may be filed and allowed by the Bankruptcy Court will not exceed the amounts set forth or described herein. Nothing set forth in these schedules shall be deemed an admission by the Debtor as to the existence, validity, priority or amount of any claim asserted against the Debtor. The Debtor fully reserves its right to object to claims, and certain claims are in and subject to dispute.

**C.**    <u>**Classes Of Claims or Interests**</u>

<u>**Unclassified Claims**</u>

17

1.    <u>Administrative Expenses</u>:  Allowed Administrative Expense Claims are claims against the estate for any costs or expenses incurred during the Chapter 11 case that are allowed and entitled to priority under §§ 503(b) and 507(a)(2) of the Bankruptcy Code, including, but not limited to, all actual and necessary expenses of preserving the estate, and all allowances of compensation or reimbursement of expenses of professionals retained by the Debtor to the extent permitted by the Bankruptcy Court.  Administrative expense claims incurred in the ordinary course of the Debtor's business operations are current, and such ongoing expenses will be paid in accordance with one or more approved budgets (see Exhibit 3 projections).

The remaining DIP loan obligations owed to Zurich, in the amount of $250,000, plus applicable interest, legal fees and expenses, are also administrative expenses of the Debtor's estate.

As indicated above, Administrative Claims include claims of the Debtor's Professionals, approved by Order of the Bankruptcy Court, which have assisted in the administration of this case. This sum includes the fees and expenses of professionals retained pursuant to Orders of the Bankruptcy Court: Debtor's counsel, Debtor's various special counsel, and the Debtor's financial advisor.  Professional fees and expenses (a) previously paid, (b) awarded and remaining to be paid, (c) already incurred, and (d) anticipated to be incurred going forward in this case are set forth in Exhibit 4.[14]

---

[14]   In accordance with the Court approved employment Orders entered in this case, certain professional fees are contingency fee-based, while others are hourly.  See Exhibit 4.

Certain Debtor's Professional fees have been awarded on an interim basis by the Court by Order dated April 30, 2020 [Docket No. 411] and remain unpaid.  Prior to the Confirmation Date of the Plan, Court approved fees and expenses shall be paid based upon Available Funds.  On and after the Effective Date of the Plan, professional fees incurred shall be paid in accordance with the Liquidating Trust.

18

2.      <u>Fees and Expenses of United States Trustee</u>:  The Liquidating Trustee shall pay all statutory quarterly fees and any applicable interest due to the Office of the United States Trustee that come due through and including the date of the earlier of the entry of a final decree closing this Chapter 11 proceeding, or dismissal or conversion of this case.  The total fees that will be incurred and owed to the United States Trustee are unknown at this time and based upon quarterly disbursements made by the Debtor.

3.      <u>Priority Tax Claims</u>:  Allowed Priority Tax Claims of governmental units that are entitled to priority in payment over Allowed Unsecured Claims pursuant to section 507(a)(8) of the Bankruptcy Code.  Priority tax claims owed to various city and state taxing authorities[15] are in the approximate aggregate sum of $722,000.

**<u>Classified Claims</u>**

<u>Class 1 Claims</u> – Construction Trust Fund, Equitably Subrogated and/or Equivalent Claims:  Class 1 Claims consist of the Allowed Construction Trust Fund, Equitably Subrogated and/or Equivalent Claims of unpaid subcontractors, suppliers and/or materialmen, exclusively in relation to the particular construction ~~projects~~project(s) of the Debtor on which such claimants worked, including without limitation, such equitably subrogated Claims of sureties Zurich and/or Chubb, to the extent such above unpaid subcontractors, suppliers and/or materialmen have been paid by such sureties of the Debtor, respectively.  With respect to Zurich, this class of claims

---

[15] State of Connecticut Department of Labor; Connecticut Department of Revenue Services; New Jersey Department of Labor and Workforce Development; State of New Jersey Division of Taxation Bankruptcy Section; City of New York Department of Taxation and Finance; New York State Department of Labor; New York State Department of Taxation & Finance; ODJFS – Tax Appeals (Ohio Department of Job & Family Services); and Pennsylvania Department of Revenue.

includes such rights of Zurich, pursuant to Final Order Pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 364 of the Bankruptcy Code Authorizing Post-Petition Secured Financing From Zurich American Insurance Company (the "DIP Order") [Docket No. 159], and the Debtor in Possession Loan Agreement and Joint Prosecution Agreement (the "DIP Loan Agreement") approved thereby, which provides in Section 24 thereof, as consented to by the Secured Banks (defined as Secured Creditors in the Loan Agreement), for the subordination of the liens or interests of the Secured Banks to the Claims of such unpaid subcontractors, suppliers and/or materialmen and/or to Zurich as assignee or subrogee of such claimants, relating to the PSEG litigation and claim proceeds.

Class 1 Claims are in the approximate aggregate sum of up to $16.46 million.  There is substantial duplication of Class 1 Claims with Class 2 and/or Class 4 Claims, which will be reviewed, reconciled and resolved by the Debtor and/or the Liquidating Trustee as part of the claims allowance and disallowance process.  The Debtor disputes certain claims in Class 1 and expressly reserves its right to object to such claims as part of the claims allowance and disallowance process.

Class 2 Claims – Secured Claims:  Class 2 Claims consist of the Allowed Secured Claims, in accordance with their respective lien priorities[16] and to the extent of the value of the subject collateral, of:

---

[16]  In accordance with the Cash Collateral Order [Docket No. 160], and except for the priming lien granted to Zurich, and the subordination of the liens or interests of the Secured Banks to the Claims of unpaid subcontractors, suppliers and/or materialmen, and/or Zurich as assignee or subrogee of such claimants, relating to the PSEG litigation and claim proceeds, as consented to by the Secured Banks in the DIP Order and Loan Agreement, the relative priorities among the secured creditors in Class 2 have not been formally determined or reduced to a Court order, and all rights of such creditors have been expressly reserved concerning such priorities; the Debtor does not, by this Disclosure Statement and the Plan (except for the priming lien of Zurich and subordination recited above) assert an official position as to the respective lien priorities among the secured creditors.

Class 2(a):  (i) Zurich, pursuant to its senior priming security interest and lien under the DIP loan, in the remaining sum of $250,000.00, plus applicable interest, legal fees and expenses; and (ii) Zurich (non-priming secured claim) in the approximate sum of $10.35 million;

Class 2(b):  the Secured Banks (Valley and HSBC, as defined in the Plan), pursuant to an intercreditor agreement, in the approximate aggregate sum of $7.6 million, plus interest and legal fees, as applicable;

Class 2(c):  the Internal Revenue Service (the "IRS"), which holds a secured tax claim ("Secured Tax Claim"), in the approximate sum of $14.6 million;

Class 2(d):  New York State Department of Taxation and Finance, which holds a Secured Tax Claim, in the approximate aggregate sum of $329,000; and

Class 2(e):  New Jersey Department of Labor ("NJDOL"), which holds a Secured Tax Claim, in the approximate sum of $153,000.

Class 2 Claims as filed and based upon reconciliation to date are in the approximate aggregate sum of $33.4 million.  There is substantial duplication of Class 2 Claims with Class 1 Claims, which will be reviewed, reconciled and resolved by the Debtor and/or the Liquidating Trustee as part of the claims allowance and disallowance process.

Class 3 Claim - Priority (Non-Tax) Claims:  Class 3 Claims consist of the Allowed Priority Claims[17] of various unions relating to claims for employee benefits.  Class 3 Claims as filed are in the approximate aggregate sum of $850,000.[18]

Class 4 Claims – General Unsecured Claims:  Class 4 Claims consist of Allowed General Unsecured Claims.  General unsecured pre-petition claims as filed against the Debtor's estate are in the approximate aggregate sum of $133 million (which includes one or more substantial unliquidated claims)[19].

Class 5 Interests – Class 5 Interests consist of the shareholder interests of the Debtor.

**D.    Treatment of Allowed Claims**

Allowed Administrative Expense Claims

Administrative Expense Claims are unimpaired.  Administrative claims of the Debtor's estate incurred in the ordinary course of the wind down of its business shall be paid in full, from Available Funds[20] (which includes cash on hand), on or as soon as practicable after the Effective

---

[17]  No priority wage claims exist against the Debtor.

[18]  The Debtor disputes the predominant majority in dollar amount of these such claims (based upon lack of statutory priority basis), which will be further reviewed and resolved by the Debtor as part of the claims allowance and disallowance process.

[19]  The Debtor disputes the overwhelming majority in dollar amount of these such claims (based upon duplication, overlap with other claims, unliquidated claims, and the availability of insurance), which will be reviewed and resolved by the Debtor as part of the claims allowance and disallowance process.  In particular, the filed unliquidated claim of Chubb, one of the Debtor's sureties, is in the approximate amount of $105 million, which represents the full face value of the penal sums of its surety bonds issued on behalf of the Debtor.  To date, other than Chubb's Class 1 Claim in the approximate sum of $~~312~~100,000, no other such claims of Chubb are owed by the Debtor (except for asserted legal fees and expenses).

[20]  "Available Funds", as defined in the Plan, mean(s) the gross proceeds from all sources, including without limitation, (a) cash on hand and/or funds on deposit, (b) proceeds of accounts receivable, (c) proceeds from causes of action, including the Affirmative Claims, (d) the sale and/or liquidation of personal property, (e) insurance refunds, (f) tax refunds, and (g) any other funds received by the Debtor to which it is legally entitled, all of the foregoing of which include the Debtor's receipt of such funds by settlement and/or litigation, less, and subject to, approved carve outs for

22

Date, within ordinary business terms, or as otherwise agreed with such creditor.  It is anticipated that the Liquidating Trust will incur and pay such claims, subject to one or more budgets approved by the Secured Parties (as defined in the Plan) (see Exhibit 3).

This class of claims also includes the outstanding principal amount of $250,000.00 (plus applicable interest, legal fees and expenses) owed to Zurich under the DIP Loan Agreement, and the rights of Zurich,  pursuant to: (i) Final Order Pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 364 of the Bankruptcy Code Authorizing Post-Petition Secured Financing from Zurich American Insurance Company [Docket No. 159] (and any Order amending same); and (ii) Stipulation and Order Pursuant to 11 U.S.C. §§ 361 and 363, for Entry of Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to HSBC Bank USA, National Association, Valley National Bank, and the Internal Revenue Service and (III) Granting Related Relief [Docket No. 160] (and any Order amending same) (the "Cash Collateral Order").  Zurich has agreed to be paid its outstanding DIP loan obligations as soon as practicable after receipt of the recovery from the PSEG Affirmative Claim.

As for the fees and expenses of the Debtor's Professionals serving in this case, consisting of the Debtor's general bankruptcy counsel and financial advisor, incurred prior to confirmation of the Plan, such Court approved fees and expenses will be paid, as agreed upon by such

---

Professional Fees, costs, U.S. Trustee fees, and operational expenses, in accordance with one or more Court Orders, and excluding any funds received in accordance with further DIP loan and/or exit financing earmarked for a particular purpose (and in connection with such financing any surplus of such funds shall be returned to the lender).

professionals and the Secured Creditors, from Available Funds, as they are or become available, which include but are not limited to proceeds realized from the Affirmative Claims.

<u>United States Trustee Claims</u>

The United States Trustee claims are unimpaired.  The Liquidating Trustee will pay all statutory fees and applicable interest due to the Office of the United States Trustee that come due through and including the earlier of the date of the entry of a final decree closing this Chapter 11 proceeding, or dismissal or conversion of this case.

<u>Priority Tax Claims</u>

Priority Tax Claims are ~~unimpaired.~~impaired as agreed upon with such Claimants.[21]  On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Priority Tax Claim of a governmental unit, as has been agreed (as authorized pursuant to Section 1129(a)(9)(C)) with each such creditor,[22] shall receive payment, including applicable

---

[21] State of New Jersey, Division of Taxation has not yet agreed to the proposed treatment of priority tax claims in the Plan (and as set forth herein), and asserts that its acceptance of such treatment is a matter to be considered for confirmation of the Plan.  Regarding the Pennsylvania Department of Revenue (the "PDR"), the Debtor, through counsel, has been unable to finalize communications with the PDR concerning the proposed plan treatment of its priority tax claim despite numerous attempts (likely due to the pandemic).  The PDR priority claim is *de minimis* ($17,436.75).

[22] State of New Jersey, Division of Taxation has not yet agreed to the proposed treatment of priority tax claims in the Plan (and as set forth herein), and asserts that such treatment is a matter to be considered for confirmation of the Plan.  Regarding the Pennsylvania Department of Revenue (the "PDR"), the Debtor, through counsel, has been unable to finalize communications with the PDR concerning the proposed plan treatment of its priority tax claim despite numerous attempts (likely due to the pandemic).  The PDR priority claim is *de minimis* ($17,436.75).

24

interest,[23] on account of such Allowed Priority Tax Claim, in accordance with the priorities under the Bankruptcy Code, after payment in full of Allowed Class 1 Claims, Allowed Class 2 Claims, Allowed Administrative Expense Claims, and Allowed Class 3 Claims, except as otherwise agreed with the Holder of such Claims.  Priority Tax Claims are impaired, and therefore Holders of Priority Tax Claims are entitled to vote to accept or reject the Plan.

<u>Class 1 Claims – Construction Trust, Equitably Subrogated and/or Equivalent Claims</u>

Upon the Effective Date, the legal, equitable and contractual rights of a holder of an Allowed Class 1 Claim will be reinstated and paid, from and after the Effective Date, in the ordinary course of business, without acceleration based upon the filing of the Chapter 11 case, in accordance with applicable non-bankruptcy law and such agreements and terms as existed as of the Filing Date, which agreements will continue in full force and effect.  To the extent the proceeds from any construction project (or related Affirmative Claim litigation) are insufficient to pay all Class 1 Claims with respect to such project, any unpaid Class 1 Claim with respect to such project shall (a) be deemed to be a General Unsecured Claim and reclassified as such (except to the extent that such claim may be part of Zurich's secured claim), (b) become impaired, and (c) be paid in accordance with the distribution to Class 4 Claimants.  Class 1 Claims are unimpaired, and therefore Class 1 is deemed to have voted to accept the Plan.

<u>Class 2 Claims – Secured Claims</u>:

On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and

---

[23] Allowed Priority Tax Claims shall receive interest on such claims at the rate of interest under applicable nonbankruptcy law, which is in effect as of the Confirmation Date.

in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder

of an Allowed Class 2 Claim shall receive payment on account of such Allowed Class 2 Claim, in

accordance with the lien priorities under the Bankruptcy Code and applicable non-bankruptcy law,

and to the extent of the value of such Holder's collateral[24], after payment in full of Allowed Class

1 Claims, subordinate and subject to approved carve outs[25], reserves and/or operating funds[26]

including for (i) U.S. Trustee fees and (ii) the Liquidating Trustee for fees and expenses (including

any of his Professionals or employees as set forth herein) in connection with the Liquidating Trust,

except as otherwise agreed with the Holder of such Claims.  Liens held by Holders of Allowed

Class 2 Claims (to the extent of the value of such Holder's collateral) shall be retained and remain

in effect until paid in full.  Further, payment of Allowed Secured Tax Claims shall include

applicable interest[27] in accordance with Sections 1129(a)(9)(D) and 1129(a)(9)(C) of the

Bankruptcy Code. Class 2 Claims are impaired, and therefore Holders of Class 2 Claims are

entitled to vote to accept or reject the Plan.

<u>Class 3 Claims – Priority (Non-Tax) Claims</u>:

On the Effective Date, or as soon as reasonably practicable after receipt of the recoveries

from any claims of the estate, including without limitation, the Affirmative Claims, subject to and

---

[24] Class 2 Claimants each have asserted secured liens and security interests in the assets of the Debtor, which, as described more fully herein, essentially comprise the Affirmative Claims.

[25] In accordance with the Cash Collateral Order, the carve out applies to the secured claims and security interests of the Secured Parties (as defined in the Plan; the Secured Banks, Zurich and the IRS).

[26] Operating funds shall be used in accordance with one or more cash collateral Orders approved by the Bankruptcy Court, or as otherwise agreed and extended in writing among the Secured Parties, in accordance with one or more approved budgets without the necessity of further Bankruptcy Court Order.

[27] Allowed Secured Tax Claims shall receive interest on such claims at the rate of interest under applicable nonbankruptcy law, which is in effect as of the Confirmation Date.

in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 3 Claim, as has been agreed with each such creditor, shall receive payment, including applicable interest,[28] on account of such Allowed Class 3 Claim, in accordance with the priorities under the Bankruptcy Code, after payment in full of Allowed Class 1 Claims, Allowed Class 2 Claims, and Allowed Administrative Expense Claims, except as otherwise agreed with the Holder of such Claims.  Class 3 Claims are impaired, and therefore Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

        <u>Class 4 Claims – General Unsecured Claims</u>:

        On the Effective Date, or as soon as reasonably practicable after receipt from the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, and after the date upon which all objections to Class 4 General Unsecured Claims have been resolved or adjudicated by the Bankruptcy Court, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds, each Holder of an Allowed Class 4 Claim shall receive payment on account of its Allowed General Unsecured Claim in the amount of its Pro Rata share of Available Funds, after payment in full of Allowed Class 1 Claims, Allowed Class 2 Claims, Allowed Administrative Expense Claims, Allowed Class 3 Claims, and Allowed Priority Tax Claims, except as otherwise agreed with the Holder of such Claims, and subordinate and subject to approved carve outs, reserves and/or operating funds,[29] including for (i) the U.S. Trustee fees

---

[28] Allowed Priority Claims shall receive interest on such claims at the rate of interest under applicable nonbankruptcy law, which is in effect as of the Confirmation Date.

[29] In accordance with the Cash Collateral Order, the Debtor is authorized to use cash collateral in accordance with one or more budget(s) approved by the secured creditors.

and (ii) the Liquidating Trustee for fees and expenses (including any of his Professionals or employees as set forth herein) in connection with the Liquidating Trust. Class 4 Claims are impaired, and therefore Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

Class 5 – Interests: Class 5 Interests consist of the shares of the Debtor held by Kenneth A. Durr, Robert Durr, Jr., Frank Heidinger and Robert Durr, Sr. The foregoing shareholders shall not retain their Class 5 Interests under the Plan. On the Effective Date, the Class 5 Interests shall be transferred to Kenneth A. Durr solely in his capacity as Liquidating Trustee. Class 5 Interests will only receive Pro Rata Distributions under the Plan and/or the Liquidating Trust, in the event that all senior classes of Allowed Claims have been paid in full. In such event such Pro Rata Distributions shall be paid as soon as reasonably practicable after receipt from the recoveries from any claims of the estate, including without limitation, the Affirmative Claims, subject to and in accordance with the Liquidating Trust, from and to the extent of Available Funds. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 5 Interests are deemed to have rejected the Plan.

**The timing and amount of Distributions to be made under the Plan and the Liquidating Trust cannot be known at this time, as such Distributions are contingent upon the recoveries under the Affirmative Claims.**

## V

## IMPLEMENTATION OF THE PLAN

Distributions to Allowed Claimants under the Plan will be funded from the Available Funds, which predominantly include and consist of the recoveries to be realized from the Affirmative Claims as prosecuted by the Liquidating Trust. The Liquidating Trustee selected by

28

the Debtor is Kenneth A. Durr ("Durr"), the President of the Debtor.  The Liquidating Trustee will implement the Plan through the Liquidating Trust and the Liquidating Trust Agreement.[30]  The Liquidating Trustee will continue with the (a) limited wind down operations, if any; and (b) prosecution of the Affirmative Claims, as well as any other claims[31] if beneficial to the Debtor's estate.

As reflected in the Second Stipulation and Order Amending and Modifying Cash Collateral Stipulation and Final Order, and the successive extensions of the Debtor's use of cash collateral the authorized by the Secured Parties in accordance with approved budgets, the Debtor presently has use of funds for continued operations and litigation claim support through October 2021.

It is the recoveries on the Affirmative Claims that form the crux of the Debtor's Plan to make and maximize distributions to the Debtor's creditors.

---

[30] As set forth in the Plan, the Liquidating Trust and the Liquidating Trust Agreement, the Liquidating Trustee and his employees shall (a) provide services relating to the Liquidating Trust and the limited operations in connection therewith and support for the prosecution of the Affirmative Claims, and (b) receive compensation therefor, in accordance with one or more cash collateral budgets approved by Bankruptcy Court Order and/or as agreed in writing by the Secured Parties.

[31] The Debtor is presently pursuing its affirmative claim against SofRock International, Inc. in an amount that exceeds $2.0 million.

Moreover, with respect to potential preference claims of the Debtor's estate, no viable claims exist which would result in a return to creditors due to the defenses of the creditors, most especially, the fact that certain limited payments made by the Debtor within the 90 day period prior to the Filing Date were paid to subcontractors, suppliers and/or materialmen, and therefore were paid from construction trust funds, which were not property of the estate. Accordingly, the payments made fail the prima facie elements of section 547 of the Bankruptcy Code.

## VI

### <u>FEASIBILITY</u>

The Plan formulated by the Debtor presents the best method for the highest level of recovery on Claims.  The continued prosecution of the Affirmative Claims, until disposition, whether by adjudication or settlement, as spearheaded by Durr, will provide the highest return to creditors.  Proper claim support by the Debtor's limited, but vital, staff, as managed and coordinated by Durr, will promote the most effective prosecution of the Affirmative Claims, and therefore the ultimate monetary recoveries thereon.  As indicated herein, with respect to the Debtor's extremely valuable PSEG and DEP Affirmative Claims, such claims are being prosecuted by special counsel under contingency fee arrangements.

The Liquidating Trustee will make distributions to allowed creditors in accordance with the ~~requirements of the absolute priority rule~~<u>Plan and the Liquidating Trust, which distributes funds</u> based upon Available Funds.

## VII

### <u>CONDITIONS PRECEDENT TO</u> ~~CONFIRMATION OF THE PLAN AND THE~~ <u>EFFECTIVE DATE</u> <u>OF THE PLAN</u>

In order for the ~~Plan~~<u>Effective Date</u> to ~~be confirmed~~<u>occur,</u> the following conditions must be fully satisfied or waived:

      (a)    the Confirmation Order must be entered by the Bankruptcy Court and be a Final Order, which such Order approves the Plan and the Liquidating Trust.

      (b)    The Liquidating Trustee has accepted, in writing, the terms of his service and compensation, and such terms shall have been approved by the Bankruptcy Court in the Confirmation Order; and

30

(c)     The Liquidating Trust has been established.

## VIII

## VOTING

Under the Plan, Priority Tax Creditors and creditors in Classes 2, 3 and 4 are impaired and entitled to vote.  To be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the deadline set by the Bankruptcy Court, at Debtor's counsel's office, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attn: Adam P. Wofse, Esq.

## IX

## REQUIREMENT FOR CONFIRMATION OF THE PLAN

**A.**     **Confirmation Hearing**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan.  The confirmation hearing (the "Confirmation Hearing") shall be scheduled by the Bankruptcy Court to be held before the Honorable Lisa G. Beckerman, in Courtroom 601, in the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004-1408.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

**B.**     **Objections to Confirmation**

The Bankruptcy Court will direct that objections, if any, to Confirmation of the Plan be in writing, filed with the Bankruptcy Court with a courtesy copy to chambers of the Honorable Lisa G. Beckerman, with proof of service, and that such objections be served on or before such date as set forth in an additional notice or Order of the Bankruptcy Court.  Objections must be served upon

31

(i) counsel to the Debtor, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York, 11793, Attention:  Adam P. Wofse, Esq.; and (ii) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attention: Andrew D. Velez-Rivera, Esq.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**C.**     **<u>Consensual Acceptance of the Plan</u>**

Section 1129 establishes the requirements for confirmation of a Chapter 11 plan.  The requirements are numerous and differ depending on whether or not confirmation is consensual.  If consensual confirmation is sought because all classes have accepted the plan, Section 1129(a) governs.  Classes of Claims that are not impaired under the Plan are deemed to have accepted the Plan.  Under the Plan, Priority Tax Claimants and Classes 2, 3 and 4 are impaired, and as a result, such Classes are entitled to vote.  However, in this case, by virtue of Class 5 having been deemed to have rejected the Plan, the Debtor will therefore seek confirmation of the Plan via cramdown.  <u>See</u> <u>Cramdown</u> Section E below.

**D.**     **<u>Confirmation of Plan</u>**

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including: (i) that the Plan has classified Claims in a permissible manner; (ii) that the contents of the Plan comply with the technical requirements of the Bankruptcy Code; (iii) that the Plan has been proposed in good faith; and (iv) that disclosures concerning the Plan have been made which are adequate and include information concerning all payments made or promised in connection with the Plan and the Chapter 11 case.  The Debtor believes that all of these conditions have been or will be met.

**E.**    <u>Cramdown</u>

For non-consensual confirmation or "cramdown" under Section 1129(b), the Debtor must meet all of the requirements contained in Section 1129(a), <u>except</u> paragraph (8) of Section 1129(a)—that each class of claims or interests must accept the plan (a given class that is unimpaired is deemed to have accepted the plan). In addition, the Debtor must show that the plan does not unfairly discriminate against any dissenting classes, and that the treatment of the dissenting classes is fair and equitable.

Given that Class 5 is already deemed to have rejected the Plan, the Debtor seeks voting from its impaired classes in order to establish at least one impaired class that votes to accept the Plan, and as such, the Debtor will seek to confirm the Plan by utilizing the cram-down provision set forth in §1129(b) of the Bankruptcy Code.

**X**

**EFFECT OF CONFIRMATION; INJUNCTION**

**A.**    <u>Effect of Confirmation</u>

On the Confirmation Date, the terms of this Plan bind all holders of all Claims against the Debtor, whether or not such holders accept this Plan.

**B.**    <u>Injunction</u>

~~Effective~~ Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, effective on the Confirmation Date, all Persons or entities who have held, hold, or may hold Claims against the Debtor or its assets are permanently enjoined from taking any of the following actions on account of such Claims: (a) commencing or continuing in any manner any action or other proceeding on account of such Claims against any assets or property of the Debtor's estate or the Liquidating

33

Trust, or property that is to be distributed under the Plan, the Liquidating Trust and/or Liquidating Trust Agreement or; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any assets or property of the Debtor's estate or the Liquidating Trust, or property to be distributed to creditors or claimants under the Plan, the Liquidating Trust and/or the Liquidating Trust Agreement, except as otherwise provided in the Lift Stay Order (which shall not be superseded by the Confirmation Order). For clarity, however, by virtue of PSEG having failed to file a claim against the Debtor in this case, in accordance with the Bar Date Order, PSEG is barred from voting on the Chapter 11 Plan and receiving any distribution in this case, and shall be subject to subpart (b) of the foregoing injunction to the extent not inconsistent with the exercise of any setoff rights.

C.    **Exculpation**

The Exculpated Parties[32] shall be exculpated to the extent permitted by and in accordance with Section 1125(e) of the Bankruptcy Code.    Nothing in this section shall (i) be construed as a release of such person's fraud, gross negligence, malpractice or willful misconduct with respect to the matters set forth in this section, (ii) limit the liability of the Debtor's professionals to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility, or (iii) release any person from any obligations as guarantor or indemnitor regarding any debt owed by, or claim against, the Debtor.

---

[32] "Exculpated Parties", as defined in the Plan, means the Debtor and any current or former agent, representative, attorney, accountant, financial advisor, other professional or employee, officer or director of the Debtor, and the Liquidating Trustee and any professional or employee of the Liquidating Trustee, but only if and to the extent, in each case, such party served in such capacity on or after the Filing Date, and only in such capacity.

34

**XI**

**ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS**

A.      **Alternatives to the Plan**

The Debtor believes that the Plan provides creditors with the earliest and greatest possible value that can be realized on their respective Claims.  The principal alternatives to confirmation of the Plan are: (i) dismissal of the case, or (ii) conversion of the case to one under Chapter 7 of the Bankruptcy Code.

(i)      Dismissal

A dismissal of this case would lead to the immediate cessation of (a) all work on the Debtor's remaining ongoing project, and (b) the orderly wind down of the Debtor's operations.  A multitude of chaotic and expensive adverse creditor actions, including lawsuits, would ensue or resume.  Further, the Debtor's employees, who are diligently working alongside special counsel for the labor and fact intensive prosecution of the PSEG Litigation and the DEP claims, would likely terminate their employment immediately.  In such event, the Debtor would have difficulty in continuing to judiciously prosecute the Affirmative Claims, which would therefore likely result in substantially less favorable dispositions of the Affirmative Claims.  Essentially, a dismissal of the case will result in the Debtor achieving drastically reduced recoveries concerning the Affirmative Claims, to the detriment of creditors.  As such, only a portion of the secured debt in this case would receive a distribution, in the order of priority under the Bankruptcy Code and applicable law, and thus, one or more secured creditors would be undersecured, with all junior claims in the case receiving no distribution whatsoever.

(ii)      Conversion to Chapter 7

35

The Debtor submits that a conversion to Chapter 7 would not be in the best interests of creditors.   As described in Section XI (B) below ("Best Interests of Unsecured Creditors"), liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code would not generate a greater distribution to creditors than proposed under the Plan.   Under Chapter 7 of the Bankruptcy Code, the appointment of a Chapter 7 trustee without the historical experience or knowledge of the Debtor's business and critical claim support as contributed by the Debtor's employees, especially relating to the Affirmative Claims, would likely result in a greatly diminished recovery to creditors.   Specifically, a Chapter 7 Trustee would likely settle the remaining Affirmative Claims at substantially reduced rates, because of the time, effort and resources of the estate which would have to be utilized and expended over a protracted period to reach a disposition of the Affirmative Claims.   Further, the secured creditors would be compelled to grant the Chapter 7 Trustee and his professionals a carve out from their liens in order for the Trustee to prosecute the Affirmative Claims.   Moreover, a conversion of the case to Chapter 7 is not sensible in that the Debtor is already liquidating in an effective and orderly manner, and has been winding down over an extended period of time.   Moreover, the additional level of administrative costs incurred by a Chapter 7 Trustee and its attorneys and accountants would be substantial, and would therefore further eradicate the ability of creditors to receive payments on their claims.

Similar to the dismissal analysis above, the only creditors that might benefit from conversion would be one or more secured creditors—likely Zurich on its priming lien and the Secured Banks on only a portion of their secured claims (thus undersecured)—with recoveries failing to reach junior secured (thus essentially unsecured), priority and general unsecured creditors. Whereas, under the Plan, more classes of creditors receive a distribution and in higher amounts than would be possible in Chapter 7.

36

Therefore, the Debtor believes that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the funds available for distribution to creditors.

**B.**    **Best Interests of Unsecured Creditors**

Notwithstanding acceptance of the Plan by Classes of Claims, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes of Claims. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired Class of Claims a recovery which has a present value at least equal to the present value of the distribution which each such creditor would receive from the Debtor if its assets were instead distributed by a Trustee under Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "Best Interests Test" with respect to all Classes of Claims since, the creditors will, in order of priority under the Bankruptcy Code, receive payments under the Plan whereby more classes of creditors would receive recoveries, and of those receiving recoveries, the most junior creditors would receive higher recoveries than they otherwise would under a Chapter 7 liquidation.

The cost of converting the case to one under Chapter 7 would include the fees of a Chapter 7 Trustee, as well as those of the Chapter 7 Trustee's counsel and other professionals that may be retained by the Chapter 7 Trustee, and unpaid expenses incurred by the Debtor during the Chapter 11 case (such as fees for attorneys and accountants). Assuming a carve out was even obtained by a Chapter 7 Trustee, these claims, and such other claims as might arise in the liquidation or result from the Debtor's Chapter 11 case, would be paid from the Debtor's assets before its assets would be available to pay all classes of claims, with each higher class of claims having to be paid in full before even reaching unsecured claims. As stated above, a Chapter 7 Trustee without the historical

37

or technical knowledge and resources that are critical to the prosecution of the Affirmative Claims typically would settle such claims at drastically reduced levels.

Whereas, it is by virtue of the prudent and proper support and prosecution of the Affirmative Claims that will result in the highest level of recoveries for the benefit of all creditors.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST POSSIBLE RECOVERY ON ACCOUNT OF CLAIMS AND THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS

**C.**    **Liquidation Analysis**

The Debtor believes that if the case was converted to Chapter 7, unsecured creditors would receive no distribution at all. A liquidation of the Debtor would likely result in vastly reduced settlements obtained in connection with the Affirmative Claims, which would likewise result in only some senior secured creditors being paid in full, with the next junior secured creditor receiving only a partial distribution, if any at all, on its claim.  At such a reduced level of recovery, all other junior creditors would receive no distribution whatsoever.  Confirmation of the Debtor's Plan will provide the greatest return to more creditors and also avoid the additional layer of Chapter 7 Administrative Claims that must be paid if the case was converted to Chapter 7.   Furthermore, the Secured Parties have been actively involved in this case and the Debtor has extensively conferred and will continue to confer with such creditors in an attempt to preserve and maximize the Debtor's assets and distributions thereof for all interested parties.

The Debtor believes that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the value of property available for distribution to most Classes of Claims.   Accordingly, the Debtor submits that confirmation of the Plan, rather than the alternatives described above, is in the best interests of creditors.

## XII

### RECOMMENDATION OF THE DEBTOR

The Plan and this Disclosure Statement were drafted and submitted by the Debtor. As such, the Debtor strongly supports this Plan and believes that Confirmation of the Plan provides the creditors with the best possible recovery in the shortest possible time.

## XIII

### ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Plan, and any other materials or questions relating to the Plan and this Disclosure Statement should be directed to Debtor's counsel, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attention:  Adam P. Wofse, Esq., at (516) 826-6500, during regular business hours.

## XIV

### TAX CONSEQUENCES

The Debtor is not aware of any tax consequences which may result from the confirmation of the Plan. Creditors should consult with their own tax advisor concerning any such tax related implications. Creditors should consult with their tax advisor concerning (a) any deductions which may be applicable to them as bad debt deductions, or (b) income tax implications based upon forgiveness of debt, if applicable, based upon the provisions of the Debtor's Plan.

Pursuant to IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code;

39

(b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based upon their particular circumstances from an independent tax advisor.

**XV**

**<u>CONCLUSION</u>**

The Debtor believes the Plan is in the best interests of all Creditors.

Dated: ~~March 11,~~April____, 2021

**LaMonica Herbst & Maniscalco, LLP**
Counsel to the Debtor

By:     ~~/s/ Adam P. Wofse~~
Adam P. Wofse, Esq.
Gary F. Herbst, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500

Dated: ~~March 11,~~April____, 2021

**Durr Mechanical Construction, Inc., Debtor**

By:     ~~/s/ Kenneth A. Durr~~
Kenneth A. Durr, President

41